# EXHIBIT 1

STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

SCOTT D. JOINER (CABN 223313)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Scott.Joiner@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR 21-00490 |
| Plaintiff, | PLEA AGREEMENT |
| v. | |
| MOHAMMED NURU, | |
| Defendant. | |

The Defendant's Promises

    1.    I, Mohammed Nuru, and the United States Attorney's Office for the Northern District of California (hereafter "the government") enter into this written Plea Agreement (the "Agreement") pursuant to Rule 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure:

    1.    I agree to plead guilty to Count One of the captioned Information charging me with Honest Services Wire Fraud in violation of 18 U.S.C. §§ 1343 and 1346.

    I agree that the elements of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, are as follows: (1) I devised or knowingly participated in a scheme or plan to deprive the City and County of San Francisco and its people of their right to my honest services as a public official; (2) the

PLEA AGREEMENT                                                    1

scheme or plan consisted of bribes or kickbacks in exchange for my services; (3) I owed a fiduciary duty to the City and County of San Francisco and its people; (4) I acted with the intent to defraud by depriving the City and County of San Francisco and its people of their right to my honest services; (5) my acts were material; and (6) I used, or caused someone to use, an interstate or foreign wire communication to carry out or to attempt to carry out the scheme or plan.

I agree that the maximum penalties for this offense are as follows:

| | | | |
|---|---|---|---|
| a. | Maximum prison term | | 20 years |
| b. | Maximum fine (Count One) | | $250,000 or not more than the greater of twice the gross gain or twice the gross loss (18 U.S.C. § 3571) |
| c. | Restitution | | |
| d. | Maximum supervised release term | | 3 years |
| e. | Mandatory special assessment | | $100 |
| f. | Potential Deportation | | |
| g. | Forfeiture | | |

I acknowledge that it is virtually certain that pleading guilty will have consequences with respect to my immigration status if I am not a natural born citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offenses to which I am pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, however, and I understand that no one, including my attorney or the district court, can predict to a certainty the effect of this conviction on my immigration status. I nevertheless affirm that I want to plead guilty regardless of any immigration consequences that may result from my guilty plea, even if the consequence is my automatic removal from the United States. I also acknowledge that there are no identical or substantially similar charges to non-removable offenses to which the government would agree.

2. I agree that I am guilty of the offense to which I am pleading guilty, and I agree that the following facts are true:

Beginning at least as early as 2008, and continuing through on or about January 28, 2020, in the Northern District of California and elsewhere, I knowingly participated in, devised, and intended to

PLEA AGREEMENT                    2

devise a scheme and plan to defraud the public of its right to my honest services, through bribery and kickbacks in breach of my fiduciary duty to the City and County of San Francisco and its citizens.

During the relevant time, I was a public official with the City and County of San Francisco ("the City"). In 2011, I became the Director of San Francisco Public Works, also known as the Department of Public Works ("DPW"). Before that I had been employed as the DPW Deputy Director for Operations since 2000. The Deputy Director of Operations was the one of the most senior positions in the department; it was one of only four deputy director positions that reported directly to the Director. In 2014, I was appointed to the Board of the Transbay Joint Powers Authority (TJPA) and eventually served as its Chair. As Deputy Director of DPW, and later as Director of DPW and Chair of the TJPA, I had the ability to exercise great influence over City business and policy, including public contracts, permits, and construction projects in the City. My power and influence extended not only to contracts and permits within the purview of DPW, but also numerous City departments and agencies.

The purpose of my plan was to use my position to obtain bribes and kickbacks in exchange for official action and the official influence that I wielded, including through the following activities and individuals:

### Walter Wong

I received a stream of cash, gifts, services, and other items of value from Walter Wong, who did business in the City through Walter Wong Construction and Jaidin Consulting, among other businesses. In exchange for these bribes and kickbacks, I helped Wong secure City contracts, sometimes after Wong was provided with confidential insider City information on competitors' bids or specifications, or being allowed to structure the requirements of the Request for Proposals (RFP) ahead of time in a manner that ensured that his company or venture would be the most-qualified bidder. I also helped him with expediting permit approvals.

My corrupt relationship with Wong began in approximately 2008. At the time I was the Deputy Director for Operations at DPW. Wong installed a gate at my home in San Francisco. At the time I knew that Wong was importing fencing from China. I expected that Wong would perform the work for free in exchange for future business with DPW and the City.

Over the course of the next several years, Wong continued to perform construction services for

PLEA AGREEMENT                      3

me for free or at significantly reduced cost, partly at my home in San Francisco, but primarily at the vacation ranch property I was building in Colusa County on Lodoga-Stonyford Road.  I never paid Wong or offered to pay him.  It was understood that Wong would pay for the construction in exchange for me exercising my official influence or taking official actions on City contracts and approvals that would benefit Wong.  For example, using DPW's emergency contract process, which did not require a public bidding process, I directed construction work on the navigation center located at 1515 South Van Ness Street to Walter Wong Construction (Emergency Contract No. 1000006861) with payments from the City to Wong's company completed during fiscal year 2017-2018. I similarly used the emergency contracting process to direct construction work on Jelani House to Walter Wong Construction (Emergency Contract No. 1000013068) with payments from the City to Wong's company completed during fiscal year 2019-2020. I also used my position and official influence to direct DPW and the Market Street Association to regularly purchase Christmas lights from one of Wong's businesses.  I also worked with a San Francisco Public Utilities Commission (SFPUC) official (SFPUC EMPLOYEE 1, whose identity is known to the government), to ensure that SFPUC would also regularly purchase tens of thousands of dollars' worth of Christmas lights from Wong's business.

      I stipulate and agree that between approximately 2008 and January 2020, in exchange for my assistance obtaining City business and City approvals, Wong provided in excess of $260,000 in labor and materials for work performed on my San Francisco home and Colusa County ranch. Wong also paid for home furnishings for me, including a chandelier, kitchen appliances, and furniture.

      In exchange for my ongoing use of my position to help his businesses, Wong also paid for me to travel to China on numerous occasions and South America on one occasion, paying for my travel expenses and reimbursing me for the cost of my international flights in cash. At my request, my friends and family members sometimes accompanied me on these international trips that Wong was arranging. On one occasion, my girlfriend at the time, Sandra Zuniga, who was employed in the San Francisco Office of the Mayor, accompanied me to South America. Wong paid for our stay at the Ritz-Carlton in Santiago, Chile.  On multiple occasions, Wong also gave me envelopes of cash, often as much as $5,000 at a time.

//

PLEA AGREEMENT                                        4

**Multimillion-Dollar Mixed-Use Development**

In exchange for free travel and luxury accommodations, high-end liquor, meals, and other gifts and benefits, I also worked with Wong to use my official position to benefit a billionaire developer in China who was developing a large multimillion-dollar mixed use project in San Francisco, California. This individual is known to the government and is referred to here as DEVELOPER 1. I was introduced to DEVELOPER 1 by Wong, who worked as a consultant for DEVELOPER 1 on many of his large developments in the City.  I met with DEVELOPER 1 and others over dinner on multiple occasions when he came to San Francisco.  Wong and an official from the San Francisco Department of Building Inspection ("DBI OFFICIAL 1," whose identity is also known to the government) would attend these dinners where we discussed DEVELOPER 1's projects. I did not pay for these dinners and believe that DEVELOPER 1's employee paid for these dinners. I also met with DEVELOPER 1 multiple times in China.  As I told Zuniga at the time, "He has a hundred and five, five-star hotels in China… Yeah, we stayed… at Seven Star Hotel, he owns it, Conrad, and then we stayed at the Park Hyatt, he owns that one.  And the last time I went with grandma we stayed at the Ritz-Carlton…. [H]e [also] gave us some stone.  I don't know how much they're worth, … I shipped them you know, they're gonna come in the ship.  They're worth tons of money… you know he's, the guy with the hotels… he's the one hooking us up…  We don't, yeah…we don't pay any hotel or anything.  They take care of us."

In exchange, I used my official position and influence to help DEVELOPER 1 obtain necessary approvals for the large, multimillion-dollar mixed-use project referred to above. As I told Zuniga, "he's very upset about because he's, you know, he thinks he's lost, he's spent so much money and he's, you know, can't see the end of the tunnel…  No, it's not done. So that was the meeting we had with him ... He had a whole list of things that we need to get done…  So we're trying to get that all resolved with the, [DBI OFFICIAL 1's] shop and Planning, a whole list of things that we need to get done…  Oh yeah, but I mean, he doesn't you know, he doesn't give money or anything.  He lets us stay in his hotels and stuff. He makes all the arrangements for us, which is good. And nice places." Whenever DEVELOPER 1 or one of his employees notified me of an issue, I would immediately direct one of my managers at DPW to solve it and expedite the process. I would also use my official influence with other city officials, including DBI OFFICIAL 1, if the problems encountered by DEVELOPER 1 fell within their area of

PLEA AGREEMENT                                                5

responsibility. As I told the FBI in January 2020, "I'm not going stand here and tell you that I didn't sleep in the hotel or I didn't really understand what was going on, I'm not going to play that game…These cats that we're talking about, I'm not in their circle, they use me to do whatever or help them, guide them." On November 4, 2018, at the end of my trip to China with Walter Wong and my daughter as I prepared to return home, I expressed my gratitude to DEVELOPER 1 for the free travel and accommodations. In exchange, I promised to help him with the mixed use development. I wrote him the following in an encrypted WeChat message:

> Thank you very much for all your generosity while we were in China. We had a great vacation and my daughter had a wonderful time. I will do my very best to see that your project gets completed. Look forward to seeing you in San Francisco when you come. Again thanks and have a great day.

DEVELOPER 1 responded the following day:

> You're welcome and thank you so much. Looking forward to seeing you in San Francisco

I communicated with DEVELOPER 1 about the mixed-use development by encrypted messaging on WeChat. For example, on July 14, 2019, DEVELOPER 1 wrote to me:

> Dear Mo Bro,
> I hope this message finds you well. I am [DEVELOPER 1], My team and I would like to express our sincere gratitude to you for your support for our [MIXED USE DEVELOPMENT]. DPW's engineer team and inspection team have been working with our job site team for months, given the challenging site conditions, trying to figure out a best solution for all of us. A coupe [sic] of days ago, our site team met with Engineer [ ], [ ] and Inspector [ ] to discuss [ ] Street issue again. Unfortunately, we still haven't got a clear recommendation from your team. As we are approaching the final stage of the project, your continuous support is much appreciated. Given [MIXED USE DEVELOPMENT] is a high-profile project, we really hope we can reach a reasonable solution and DPW will sign off for final inspection soon.
> Thank you very much for your support, Bro!
> Best regards.
> [DEVELOPER 1]

I responded "Hope all is well with you and the family. I will make sure we get this issue resolved this week. Will text you to let you know what the resolution is. As always it's great to hear from you. Thank you." I also communicated with Walter Wong about the project using WeChat. At times I would paste DEVELOPER 1's messages into a WeChat message to Wong seeking his advice on how I should

PLEA AGREEMENT                                      6

respond. These messages included discussions in 2019 about expediting DPW's review of the project in order to obtain final approvals.

I stipulate and agree that I utilized interstate and international wire communications in furtherance of my scheme, including an international phone call while I was in China, which I made on or about October 24, 2018, to DPW EMPLOYEE 1 (a DPW employee whose identity is known to the government) in San Francisco, in order to discuss the status of DEVELOPER 1's mixed-use development project.

**Recology**

Recology Inc. is a waste management company headquartered in San Francisco and the direct or indirect parent company of Sunset Scavenger Company, Golden Gate Disposal & Recycling Company, and Recology San Francisco (all three together referred to as the "SF Recology Group, and collectively with Recology Inc. as "Recology")).  Recology Inc. provided refuse collection and disposal services for residential and commercial customers in the City, as well as for the City itself, through the SF Recology Group.

As Director of DPW, I presided over the process that governed the rates that Recology could charge in San Francisco for its services, and I was responsible for recommending whether the Rate Board should approve any rate increase for Recology. I could also influence rates, known as tipping fees, that Recology charged DPW when DPW dumped materials at a Recology facility called Sustainable Crushing. Similarly, I could approve, deny, or otherwise affect operational changes that Recology wanted to make in San Francisco. Because of my position, I had the ability to make business very difficult or very good for Recology by exercising my official influence or by taking, or failing to take, certain official actions.

I accepted various items of value from Recology.  In exchange for these items of value, I used my official position to help Recology's business as opportunities arose.

Among other things, Recology regularly paid for my meals, including expensive steak dinners and numerous meals during breakfast meetings between myself, other DPW employees, and various Recology executives. Recology also paid for my hotel room and that of another senior City official during a two-night a trip to New York on City business in December 2017.  Similarly, Recology

delivered a significant amount of free soil to my private ranch property in Colusa County.

In addition, knowing that Recology wanted to keep me happy for the success of its business, and in exchange for my continued favoritism, I asked Recology to pay hundreds of thousands of dollars to San Francisco Non-Profit A in the form of donations for a cleaning program known as Giant Sweep. During the relevant period, San Francisco Non-Profit A would then donate the payments to another non-profit, which administered funds for the Giant Sweep program. I was able to access these funds for a variety of uses—including procuring goods and services for staff meals and appreciation events, volunteer programs, merchandise, community support, and events from specific vendors—in addition to their originally designated purpose for Giant Sweep. From 2014 through the end of 2019, Recology donated approximately $150,000 per year for the Giant Sweep, in $30,000 installments—for a total of approximately $750,000.

Additionally, at my request, Recology hired my son to work as laborer, primarily removing graffiti from garbage dumpsters. Between 2015 and 2017, Recology paid him approximately $17,000 for his work. Recology also funded a paid internship for my son at a different non-profit organization. Between 2017 and 2018, Recology paid approximately $23,600 to fund this paid internship.

Similarly, between 2016 and 2019, at my request, Recology also paid approximately $60,000 to fund DPW holiday parties. Recology made these payments through the Lefty O'Doul's Foundation, a non-profit organization run by Nick Bovis.

**Nick Bovis**

In exchange for my official acts and influence, which included my assistance or promised assistance with public business opportunities with the City, I received a number of bribes from restaurateur Nick Bovis. These bribes included: free meals and entertainment for me and my family members and associates at various restaurants that Bovis owned and thousands of dollars in free appliances for my ranch property. I also anticipated that I would receive tens of thousands of dollars in kickbacks from the proceeds that Bovis would earn from City concessions, contracts, or subcontracts awarded to him or his associates because of my official acts or influence.

For example, I helped Bovis in a plan to win a bid for a restaurant lease at San Francisco International Airport (SFO). Bovis expected to make money from the SFO concession and I expected

PLEA AGREEMENT                          8

that Bovis would continue providing items of value to me in exchange for my help with the airport concession process and other public contracts.

In or about early 2018, at the same time that we were discussing my assistance with the SFO concession and other City business opportunities, I gave Bovis a price list of appliances that I wanted for my ranch. I wanted him to check whether, through his restaurant business, he could get more favorable pricing. Bovis later purchased the appliances for me and brought them to the ranch. I accepted them, in exchange for my continued official action and influence as a public official. I stipulate and agree that the appliances I received from Bovis were worth approximately $22,000.

### Florence Kong

In or about December 2019, in exchange for past official action, I also accepted a gold Rolex watch from Bay Area businesswoman Florence Kong. I stipulate and agree that the value of the watch was approximately $36,550. During the relevant time, I used my official position to benefit Kong's businesses in exchange for the Rolex, cash, free meals, and other items of value, including an iron fence that Kong installed at my ranch property. As one example, in exchange for these items of value, I used my official position to direct business to SFR Recovery Inc., a recycling business that Kong owned which had a contract with the City to dispose of construction debris.

### Balmore Hernandez, William Gilmartin, & Alan Varela

Beginning in or about 2013, and continuing through on or about January 28, 2020, I also accepted a series of bribes and kickbacks from Balmore Hernandez, William Gilmartin, and Alan Varela in exchange for past and future official actions that benefitted their various business ventures. The items of value that I received or that were promised to me included free meals and entertainment, cash, free labor and materials for my ranch, a brand new tractor, and a portion of the proceeds that they expected to earn from City contracts or subcontracts awarded to them or their associates as a result of my official acts or the influence I exerted in my official capacity. One part of our plan included helping Varela and Gilmartin's joint venture win a supply contract with DPW and a related lease with the Port of San Francisco (the "Port") to operate an asphalt recycling plant and a concrete plant on Port land. In the early stages, I helped the group prepare their proposal by providing inside non-public information on the project, often through emails (using my private rather than my work email) and phone calls with

PLEA AGREEMENT                                              9

Hernandez, or through regular dinning meetings in San Mateo, California, with Gilmartin and Hernandez. Gilmartin paid for these dinners, which often cost in excess of $1,000. I agree that Gilmartin spent approximately $20,000 on these dinners during the relevant period. I stipulate that the benefit to me for these dinners was approximately $7,000.

As part my corrupt dealings with the group, and prior to their joint venture's selection in 2015 as the most qualified proposal for the asphalt and concrete plants, Gilmartin promised me $100,000 if I would use my official position to pressure a large developer, COMPANY 4, to select one of Gilmartin and Varela's joint-venture partners for the asphalt plant, COMPANY 2, to help develop a different, much larger project in San Francisco for COMPANY 4.  I agreed and told COMPANY 4 that I wanted COMPANY 2 selected for the larger project. COMPANY 4 complied. COMPANY 4 was subject to my influence because it needed DPW approvals for much of what it was doing on this project and other largescale developments elsewhere in the City.

I did not receive the $100,000 promised to me right away, and this became a point of contention between me and the group.  Although I did receive approximately $25,000 in cash from Hernandez later that year, in or around September 2015, it was not until the following year that the group began fulfilling its remaining commitment to me through Hernandez, who provided free labor and materials for work at my ranch. During the relevant period, Hernandez provided approximately $250,000 in labor and materials for work on my ranch.

As part of our ongoing scheme, I also requested that the group provide me with a tractor for my ranch, which Alan Varela arranged to deliver to the ranch in February 2019.  For purposes of the Guidelines calculations below, I stipulate that the value of the benefit conveyed to me (use of the tractor) was approximately $20,000.

### Zuniga Money Laundering

In or around 2010, I bought a 10-acre lot in Stonyford, California (Colusa County) from a neighbor for $100,000. The lot became part of a property that I was developing, often with free labor and materials provided by City contractors who were seeking favors from me. The neighbor gave me a private mortgage for the lot, to be repaid in $1,000 installments. I used the proceeds of my honest services fraud scheme to pay the mortgage.  To conceal and disguise the source of the proceeds, I

PLEA AGREEMENT                        10

funneled the money through Sandra Zuniga to make the monthly $1,000 payments out of her checking account. She had no ownership interest in the property. From at least in or around 2014 through August 2017, I would give Zuniga approximately $1,000 per month, generally in cash, although I occasionally directed her to take money from my account or one of my daughters' bank accounts. Zuniga would then deposit the money into her bank account and make the payment of $1,000 to my neighbor. I stipulate and agree that Zuniga paid at least $42,000 of the mortgage this way.

### Other Bribes

In or around 2018, I also accepted $20,000 in U.S. currency from FORMER GOVERNMENT EMPLOYEE 1, whose identity is known to the government, in exchange for using my position to help another individual obtain an engineering job with the City. I received the cash in three installments: $10,000, $5,000, and $5,000. Ultimately this individual was not able to maintain employment with the City.

I also accepted cash and other items of value from another contractor in exchange for business with City for his firm. This contractor's identity is known to the government and is referred to here as CONTRACTOR 1. On certain occasions I funneled this money through Sandra Zuniga. For example, in 2018 CONTRACTOR 1 wrote a check to Zuniga for $5,000. At my direction, Zuniga used the money to pay for work on my ranch property and to pay other joint bills we had. Similarly, in 2014 CONTRACTOR 1 wrote a check to Zuniga in the amount of $9,750 for "housesitting." Zuniga did not perform any housesitting for CONTRACTOR 1. She instead spent the money at my direction and for my benefit, including spending $7,100 of it for my half of a down payment on a home we shared in Stonyford, California.

In exchange for official assistance, I also accepted cash bribes from DEVELOPER 2. DEVELOPER 2 is a prominent developer in San Francisco whose identity is known to the government. The cash bribes usually consisted of a couple of thousand dollars which DEVELOPER 2 would give me during the holidays, including in or around December 2019. DEVELOPER 2 would then call me if he had any problems with DPW-related approvals or other matters and I would help resolve whatever issues he was facing.

//

**Obstruction of Justice/False Statement**

In January 2020, after the government confronted me with its knowledge of my illegal activities, I agreed to cooperate with the government's ongoing public corruption investigation. I made my initial appearance before the Court on a separate criminal complaint on January 21, 2020. At that time, I was released to the supervision of the FBI based on my anticipated cooperation with the pending investigation. The Court admonished me on the conditions of my release. One of the conditions of my release prohibited me from tampering with any witness or obstructing any criminal investigation. Another condition prohibited me from disclosing my cooperation with the government. In addition, both before and after my initial appearance, I was instructed by FBI agents that I was not to disclose my arrest, the investigation or my cooperation to anyone because doing so would compromise the investigation. Pursuant to my original proffer agreement, I agreed to truthfully and completely disclose all information that was the subject of inquiry during meetings with the government. The same agreement advised me that statements I made during meetings with the government could be used against me in a prosecution for perjury, false statement, or obstruction of justice.

During meetings with the government on and before January 27, 2020, I admitted that I accepted gifts and other items of value in exchange for official acts as the Director of DPW. During a meeting with the government on January 27, 2020, however, I repeatedly told the FBI that I had not disclosed my arrest, the investigation, or my cooperation to anyone that I worked with at City Hall. This was a lie, which I admitted later in the meeting when I was confronted with the government's knowledge that I had discussed my arrest and promised cooperation with a senior City official. In truth, I had alerted a number of subjects and witnesses in the investigation about my situation and the charges against me, including Balmore Hernandez and others, warning them that I had been arrested and was working with the FBI and that future conversations might be recorded.

I agree that I made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the government of the United States, by telling Special Agents of the FBI that I had not disclosed my arrest, the pending investigation into public corruption, and my purported cooperation with the government regarding the same, to anyone that I worked with at San Francisco City Hall or other subjects and witnesses in the investigation.

3. I agree to give up all rights that I would have if I chose to proceed to trial, including the rights to a jury trial with the assistance of an attorney; to confront and cross-examine government witnesses; to remain silent or testify; to move to suppress evidence or raise any other Fourth or Fifth Amendment claims; to any further discovery from the government; and to pursue any affirmative defenses and present evidence. I also agree to waive venue, if necessary, for the charges filed in this case.

4. I agree to give up my right to appeal my conviction, including constitutional challenges to the statutes of conviction. I agree to give up my right to appeal the judgment and all orders of the Court. I also agree to give up my right to appeal any aspect of my sentence, including any orders relating to forfeiture and/or restitution, reserving only my right to claim that my sentence violated this plea agreement, applicable law, or the Constitution. I reserve my right to claim that my counsel was ineffective. I understand that this waiver includes, but is not limited to, any and all constitutional or legal challenges to my convictions and guilty plea, including arguments that the statutes to which I am pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support my plea of guilty.

5. I agree not to file any collateral attack on my conviction or sentence, including a petition under 28 U.S.C. § 2255 or 28 U.S.C. § 2241, except that I reserve my right to claim that my counsel was ineffective.

6. I agree not to ask the Court to withdraw my guilty plea at any time after it is entered. In the event I violate any of the terms of the Agreement, I agree that the facts set forth in Paragraph 2 of this Agreement and, if applicable, the fact that I made a sworn admission to them in a previous court proceeding, shall be admissible against me in any subsequent proceeding, including at trial. In any subsequent proceeding conducted after I violate any of the terms of the Agreement, I expressly waive any and all rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410 with regard to the facts set forth in Paragraph 2 of the Agreement and, if applicable, the fact that I made a sworn admission to them at a previous court proceeding.

7. I understand that the Court must consult the United States Sentencing Guidelines and take them into account when sentencing, together with the factors set forth in 18 U.S.C. § 3553(a). I

PLEA AGREEMENT 13

also understand that the Court is not bound by the Guidelines calculations below; the Court may conclude that a higher Guidelines range applies to me, and, if it does, I will not be entitled, nor will I ask, to withdraw my guilty plea.  I further agree that regardless of the sentence that the Court imposes on me, I will not be entitled, nor will I ask, to withdraw my guilty plea.  I agree that the Sentencing Guidelines offense level should be calculated as set forth below, and that I will not request a downward departure under the Sentencing Guidelines from that offense level although I reserve the right to seek a downward variance based on the factors set forth in 18 U.S.C. § 3553(a).  I understand that the government is free to oppose any such request. The parties have reached no agreement regarding my Criminal History Category.

    a.    Base Offense Level, U.S.S.G. § 2C1.1(a)(1):    14

    b.    Specific offense characteristics under U.S.S.G. Ch. 2
- More than one bribe (U.S.S.G. § 2C1.1(b)(1))    +2
- Payment or value of the benefit to be received in return for payment more than $550,000 but less $1.5 million (U.S.S.G. §§ 2C1.1(b)(2) 2B1.1(b)(1)(H))    +14
- High-level public official (U.S.S.G. § 2C1.1(b)(3))    +4

    c.    Adjustments under U.S.S.G. Ch. 3
- Obstruction of justice (U.S.S.G. § 3C1.1)    +2

    d.    Acceptance of Responsibility:    - 3
If I meet the requirements of U.S.S.G. § 3E1.1, I may be entitled to a three-level reduction for acceptance of responsibility, provided that I forthrightly admit my guilt, cooperate with the Court and the Probation Office in any presentence investigation ordered by the Court, and continue to manifest an acceptance of responsibility through and including the time of sentencing.

    e.    Total Adjusted Offense Level:    33

8.    I agree that regardless of any other provision of this Agreement, the government may and will provide the Court and the Probation Office with all information relevant to the charged offenses and the sentencing decision, including Victim Impact Statements.  I agree that, based on the nature of the offense, the Court should impose the following special condition of supervised release which is reasonably related to deterrence and rehabilitation:

<u>Special Condition (Searches)</u>
The defendant shall submit his person, residence, office, vehicle, electronic devices and

PLEA AGREEMENT    14

their data (including cell phones, computers, and electronic storage media), and any property under defendant's control to a search. Such a search shall be conducted by a United States Probation Officer or any federal, state, or local law enforcement officer at any time, with or without suspicion. Failure to submit to such a search may be grounds for revocation; the defendant shall warn any residents that the premises may be subject to searches.

9. I agree that I will make a good-faith effort to pay any fine, forfeiture, or restitution I am ordered to pay. I agree to pay the special assessment at the time of sentencing.

I agree to pay full restitution for all losses caused by all the schemes or offenses with which I was charged in this case, and I understand that the amount of restitution will not be limited to the loss attributable to the count to which I am pleading guilty, pursuant to 18 U.S.C. § 3663(a)(3). I understand that the Court will not consider my economic circumstances in determining the restitution amount. I agree to pay restitution in an amount to be set by the Court at the time of sentencing.

Any restitution payments shall be paid through the Office of the Clerk of the District Court by bank or cashier's check or money order made payable to the "Clerk, United States District Court."

I understand that the restitution described above creates a lien in favor of the United States on all property and rights to property I may possess upon entry of judgment and continues for the later of 20 years from the entry of judgment or 20 years after release from imprisonment or until the debt is paid in full. I further understand the government will record a notice of the lien in any county where I reside or have property. I further understand that this order of restitution cannot be discharged in bankruptcy and that if I default on the payment of a fine or restitution, the Court may revoke probation or a term of supervised release, modify the terms or conditions of probation or supervised release, resentence me, hold me in contempt of court, order the sale of property, enter or adjust a payment schedule, or take any other action necessary to obtain compliance.

Within thirty days of the execution of this Plea Agreement, if asked by the Financial Litigation Unit ("FLU") of the United States Attorney's Office, I agree to complete, under penalty of perjury, a financial statement provided by the U.S. Attorney's Office and to update that statement with material changes within seven days of the change. I understand that I must identify all assets and financial interests valued at more than $1,000. I further understand that these assets and financial interests include all assets and financial interests in which I have an interest direct or indirect, whether held in my

PLEA AGREEMENT                                15

own name or in the name of another, in any property, real or personal.

I agree to surrender assets I obtained as a result of my crimes, and release funds and property under my control in order to pay any fine, forfeiture, or restitution. I further agree to notify the FLU before transferring any interest in property owned directly or indirectly by me, including any interest held or owned under any other name or entity, including trusts, partnerships, and/or corporations. I also agree to notify the FLU of any interest in property I may obtain, directly or indirectly, which is valued at more than $1,000, and which includes any interest obtained under any other name, or entity, including a trust, partnership, or corporation, after the execution of this Plea Agreement until the fine or restitution is paid in full.

I agree that any fine, forfeiture, or restitution imposed by the Court against me will be due immediately and subject to immediate enforcement by the government as authorized by 18 U.S.C. § 3613. I further understand that the government may seek immediate collection of the entire fine, forfeiture, or restitution from any assets without regard to any schedule of payments imposed by the Court or established by the Probation Office and that monetary penalties imposed by the Court will be submitted to the Treasury Offset Program so that any federal payment or transfer of returned property I receive may be offset and applied to federal debts.

10. I agree not to commit or attempt to commit any crimes before sentence is imposed or before I surrender to serve my sentence. I also agree not to violate the terms of my pretrial release; not to intentionally provide false information to the Court, the Probation Office, Pretrial Services, or the government; and not to fail to comply with any of the other promises I have made in this Agreement. I agree that if I fail to comply with any promises I have made in this Agreement, then the government will be released from all of its promises in this Agreement, including those set forth in The Government's Promises Section below, but I will not be released from my guilty plea.

11. I agree to forfeit my interest in the following property (hereinafter "subject property"):

    a. The real property and improvements located at ▓▓▓▓▓▓ Stonyford CA, 95979 (APN: ▓▓▓▓▓▓); and

    b. The real property and improvements located at ▓▓▓▓▓▓ Stonyford, CA 95979 (APN: ▓▓▓▓▓▓).

PLEA AGREEMENT                16

I admit that the Subject Property is forfeitable to the United States pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c) and the procedures outlined in Rule 32.2 of the Federal Rules of Criminal Procedure and 21 U.S.C. § 853.  I relinquish any and all right, title, and interest I may have in the Subject Property and agree that Subject Property can be forfeited to the United States without further notice to me.  I also agree I will not contest any administrative or judicial forfeiture proceeding (whether criminal, civil, state or federal) which may be brought against the Subject Property. I further agree to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Agreement on any ground, including that the forfeiture constitutes an excessive fine or punishment or that the forfeiture proceeding was brought in violation of any statute of limitations.

I agree to fully assist in effectuating the surrender and forfeiture of the Subject Property to the United States, and I agree to take whatever steps are necessary to ensure that clear title thereto passes to the United States, including the execution of any documents necessary to effectuate the surrender and forfeiture of the Subject Property to the United States.  I agree to take all steps necessary to preserve the value of the Subject Property up until I am sentenced by, among other things, maintaining, insuring, and making mortgage payments on the Subject Property.

12.     Understanding that the government has in its possession digital devices and/or digital media belonging to and seized from me, I waive any right to the return of digital data contained on those digital devices and/or digital media and agree that if any of these digital devices and/or digital media are returned to me, the government may delete all digital data from those digital devices and/or digital media before they are returned to me.

13.     I agree that this Agreement contains all of the promises and agreements between the government and me, and I will not claim otherwise in the future.  No modification of this Agreement shall be effective unless it is in writing and signed by all parties.

14.     I agree that the Agreement binds the U.S. Attorney's Office for the Northern District of California only, and does not bind any other federal, state, or local agency.

The Government's Promises

15.     The government agrees to move to dismiss any open charges pending against the

PLEA AGREEMENT                           17

defendant in the captioned Information at the time of sentencing.

16. The government agrees not to file any additional charges against the defendant that could be filed as a result of the investigation that led to the captioned Information.

17. In light of the defendant's pre-indictment resolution, and his prompt and ongoing willingness to plead guilty and resolve the case against him soon after he was charged in early 2020, the government agrees to recommend a sentence of no more than 108 months in custody, unless the defendant violates the terms of the Agreement above or fails to accept responsibility.

The Defendant's Affirmations

18. I confirm that I have had adequate time to discuss this case, the evidence, and the Agreement with my attorney and that my attorney has provided me with all the legal advice that I requested.

19. I confirm that while I considered signing this Agreement, and at the time I signed it, I was not under the influence of any alcohol, drug, or medicine that would impair my ability to understand the Agreement.

20. I confirm that my decision to enter my guilty plea is made knowing the charges that have been brought against me, any possible defense, and the benefits and possible detriments of proceeding to trial. I also confirm that my decision to plead guilty is made voluntarily, and no one coerced or threatened me to enter into this Agreement.

Dated: 12/16/2021

MOHAMMED NURU
Defendant

STEPHANIE M. HINDS
Acting United States Attorney

Dated: 12/17/2021

SCOTT D. JOINER
Assistant United States Attorney

21. I have fully explained to my client all the rights that a criminal defendant has and all the terms of this Agreement. In my opinion, my client understands all the terms of this Agreement and all

PLEA AGREEMENT                                18

the rights my client is giving up by pleading guilty, and, based on the information now known to me, my client's decision to plead guilty is knowing and voluntary.

Dated: 12/16/2021

ISMAIL RAMSEY
Ramsey & Ehrlich LLP
Attorneys for Defendant

PLEA AGREEMENT                    19