STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

ALEXANDRA SHEPARD (CABN 205143)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    alexandra.shepard@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. 21-CR-0490 WHO |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | |
| MOHAMMED COLIN NURU, | |
| Defendant. | |

## **CONTENTS**

I. INTRODUCTION ..................................................................................................................1

II. FACTS .....................................................................................................................................1

    A. Nuru Takes Bribes From City Contractors in Exchange for Official Acts.........................1

    B. Nuru Launders the Proceeds of His Bribery Through His Girlfriend................................4

    C. Nuru Lies to the FBI and Obstructs the Government's Investigation ...............................4

III. THE SENTENCING GUIDELINES CALCULATION AND THE PLEA AGREEMENT ........................................................................................................................5

IV. DISCUSSION .........................................................................................................................6

    A. Legal Standards..................................................................................................................6

    B. Sentencing Recommendation.............................................................................................6

V. CONCLUSION ......................................................................................................................12

# TABLE OF AUTHORITIES

**Federal Cases**

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) ............................................................... 6

*United States v. Ganim*, 2006 WL 1210984 (D. Conn. May 5, 2006) ..................................... 10

*United States v. Serafini*, 233 F.3d 758 (3rd Cir. 2000) ............................................................ 9

*United States v. Spano*, 411 F.Supp.2d 923 (N.D. Ill. 2006), affirmed, 477 F.3d 517 (7th Cir. 2006) ... 11

**Federal Statutes**

18 U.S.C. § 3553 ........................................................................................................................ 6

**Federal Rules**

U.S.S.G. § 2B1.1 ........................................................................................................................ 5
U.S.S.G. § 2C1.1 ........................................................................................................................ 5
U.S.S.G. § 3C1.1 ........................................................................................................................ 5

## I. INTRODUCTION

This is a tale of greed as old as time. Mohammed Nuru, a powerful appointed public official in the City of San Francisco, shook down multiple contractors eager for lucrative City business for well over a million dollars in cash, goods and services over a 12-year period. Much of that money went to fund his ranch in Stonyford, California, a property whose mortgage was partly paid by laundered bribes from City contractors, with a large home custom-built and furnished by City contractors, on grounds maintained with the help of equipment and soil provided by City contractors. In return for these bribes, Nuru used his influence and power as Deputy Director and then Director of San Francisco Public Works ("DPW") to take official actions on behalf of the contractors.

Nuru corrupted his office for personal gain for many years, and his conduct warrants a substantial sentence. The United States respectfully submits this Sentencing Memorandum with a recommendation that the Court sentence Nuru to 108 months imprisonment, followed by a three-year term of supervised release, and a fine of $35,000.

## II. FACTS

From 2000 to 2020, Nuru was one of the most senior and influential public officials in the City of San Francisco. As Deputy Director of DPW, and then Director of DPW and Chair of the Transbay Joint Powers Authority, Nuru had the ability to exercise great influence over City business and policy, including public contracts, permits, and construction projects within the purview of DPW and also numerous other City departments and agencies. He used that power and influence to shake down multiple City contractors for money and other benefits. After he was arrested, he tipped off numerous individuals to the government's investigation and then lied about that fact to the FBI.

### A. Nuru Takes Bribes From City Contractors in Exchange for Official Acts

In his plea agreement, and as further described in the PSR and the myriad of charging documents, plea agreements, and sentencing memoranda filed in connection with the government's investigation, Nuru admitted to taking bribes from multiple people with business before DPW, as well as the City's longtime garbage company Recology. The bribes spanned a period of approximately twelve years, from 2008 to approximately January 2020. Nuru's conduct is summarized below.

Businessman Walter Wong bribed Nuru with a steady stream of benefits, including approximately $260,000 in construction work on Nuru's ranch in Stonyford, California, home furnishings for the ranch, international travel for Nuru and his friends and family, and envelopes of cash.[1]  In return, Nuru used his position to take official actions on Wong's behalf over a period of years. He repeatedly subverted the City's competitive bidding process by providing Wong with competitor bidding information, allowing Wong to draft Requests for Proposal to ensure that Wong's businesses would be the most qualified bidder, and even bypassing the competitive bidding process altogether to give Wong two lucrative construction contracts using DPW's emergency contract process. Nuru also helped expedite permit approvals for Wong's projects with the City. Nuru provided similar assistance for Wong's client, Developer 1; when Nuru couldn't accomplish what Developer 1 needed, he would use his influence with other City officials.

Nuru engaged in similar schemes with others who had business with the City.  In return for Nuru's assistance in securing contracts and concessions with the City, restaurateur and entrepreneur Nick Bovis gave Nuru approximately $22,000 in kitchen appliances for Nuru's ranch, as well as free meals and entertainment for Nuru's family and friends.[2]  Nuru also expected to receive tens of thousands of dollars in kickbacks from the proceeds of Bovis's ventures with the City.  Bovis also used his children's charity, the Lefty O'Doul's Foundation for Kids, as a vehicle to receive payments from City contractors including Recology for Nuru's lavish DPW holiday party for City officials and VIPs.

Businesswoman Florence Kong showered Nuru with gifts, including a $36,550 gold Rolex watch, cash, improvements on Nuru's ranch, and free meals, in return for Nuru's official actions on behalf of her business, SFR Recovery.[3]  Nuru assisted Kong in a variety of ways, including by extending a bidding deadline for the San Francisco Animal Care and Control building so that SFR Recovery could submit a bid, and speaking to a DPW employee about giving SFR Recovery more DPW business.

---

[1] Wong pled guilty pursuant to a cooperation plea agreement to bribing Nuru and is awaiting sentencing. *See United States v. Walter Wong*, 20-CR-0257 WHO.

[2] Bovis pled guilty pursuant to a cooperation plea agreement to bribing Nuru and has not yet been sentenced. *See United States v. Nick Bovis*, 20-CR-0204 WHO.

[3] Kong pled guilty to bribing Nuru and making false statements to the FBI and was sentenced to one year and one day in prison and a $95,000 fine. *See United States v. Florence Kong*, 20-CR-0354 WHO.

Balmore Hernandez, Alan Varela and William Gilmartin engaged in a years-long scheme to bribe Nuru to ensure the success of their individual and collective business ventures.[4] They gave Nuru cash, free meals and entertainment, and equipment including a John Deere tractor and attachments worth more than $40,000 for Nuru's ranch. Hernandez even sent workmen to Nuru's ranch to help build the large home and improve the property. Nuru, in return, helped the trio in a variety of ways. They focused in large part on winning a supply contract with DPW and a related lease with the Port of San Francisco to operate an asphalt recycling plant and concrete plant on Port land. In exchange for cash and other items of value, as well as a potential share of the future profits, Nuru agreed to use his official position in an effort to have their proposal selected as the most qualified bidder, including by providing them with insider non-public information on the project for their use in preparing their proposal.

Senior executives of Recology's San Francisco Group also arranged for Recology to provide a steady stream of financial and other benefits to Nuru to ensure that he would help their business as opportunities arose.[5] In particular, Recology wanted Nuru to approve their periodic requests for highly lucrative rate increases, worth hundreds of millions of dollars to the company. They also sought his assistance with a price increase for the dumping fees that Recology's subsidiary Sustainable Crushing charged the City. At Nuru's direction, Recology also gave Nuru $150,000 a year for five years, in the form of a donation to Non-Profit A for a DPW anti-litter campaign called Giant Sweep. Nuru then arranged for Non-Profit A to swiftly "donate" that money, minus a cut, to Non-Profit B, which actually administered the funds for Giant Sweep. Some of the money was used for Giant Sweep, but Nuru used

---

[4] All three individuals pled guilty to honest services wire fraud for their roles in the scheme to bribe Nuru. Hernandez and Gilmartin pled guilty pursuant to cooperation agreements and are awaiting sentencing. Alan Varela was sentenced to 24 months in prison and a $127,000 fine. *See United States v. Balmore Hernandez*, 20-CR-0204 WHO; *United States v. Alan Varela and William Gilmartin III*, 21-CR-0192 WHO.

[5] Recology's San Francisco Group and two of its executives have been charged for conspiring to bribe Nuru. Recology's three San Francisco subsidiaries, which comprise its San Francisco Group, entered into a deferred prosecution agreement and were charged by Information with conspiracy to commit honest services wire fraud for bribing Nuru. *See United States v. Sunset Scavenger Company, Golden Gate Disposal & Recycling Company, and Recology San Francisco*, 21-CR-0356 WHO. Recology's former San Francisco Group Government and Community Relations Manager pled guilty pursuant to a cooperation plea agreement for his role in the conspiracy to bribe Nuru. *See United States v. Paul Giusti,* 21-CR-0294 WHO. Recology's former Vice President and San Francisco Group General Manager, John Porter, was indicted for his role in the same conspiracy to bribe Nuru. *See United States v. John Francis Porter*, 22-CR-0270 WHO.

the balance as a slush fund which he controlled. At Nuru's request, Recology also gave Nuru's son a job from 2015 to 2017, and then funded a summer internship for his son at a non-profit on whose board Recology executive Paul Giusti sat. Nuru also solicited $60,000 in payments from Recology from 2016 to 2019 for the DPW holiday party—not actually a holiday party for DPW employees, but a vehicle for Nuru to showcase his power and influence in the City.

In his plea agreement, and as described in the PSR, Nuru also admitted to taking tens of thousands of dollars in bribes from three other individuals who expected him to use his official position to help them.

### B. Nuru Launders the Proceeds of His Bribery Through His Girlfriend

Nuru also admitted to using bribe money to pay at least $42,000 of the mortgage on an additional 10-acre lot he purchased for his ranch. In order to disguise the illegal source of those monthly mortgage payments, Nuru gave the money to his girlfriend, former Director of the Mayor's Office of Neighborhood Services and Director of the City's Fix-It Team, Sandra Zuniga.[6] Zuniga, whose relationship with her former boss Nuru was not public, used the money to make the monthly mortgage payment on the property, although she didn't have any ownership interest in it.

Nuru also laundered other bribe proceeds through Zuniga. In exchange for business with the City, Contractor 1 wrote two checks to Zuniga, one for $9,750 for "housesitting" in 2014, and one for $5,000 in 2018. At Nuru's direction, Zuniga used the money from Contractor 1 to pay for work on the ranch, pay Nuru's half of a down payment on another house he shared with Zuniga near the ranch, and also to pay some of their joint bills.

### C. Nuru Lies to the FBI and Obstructs the Government's Investigation

In January 2020, after Nuru was arrested, he immediately agreed to cooperate with the government's ongoing public corruption investigation and admitted accepting gifts and other items of value in exchange for official acts. In pretrial Court proceedings and as a condition of his cooperation with the FBI, Nuru was instructed not to tamper with witnesses, obstruct any criminal investigation, or

---

[6] Zuniga pled guilty pursuant to a cooperation plea agreement to engaging in a money laundering conspiracy with Nuru and is awaiting sentencing. *See United States v. Sandra Zuniga*, 21-CR-0096 WHO.

U.S. SENTENCING MEMORANDUM  4
21-CR-0490 WHO

disclose his cooperation with the government. He was specifically instructed by FBI agents not to disclose his arrest, the investigation or cooperation to anyone because doing so would compromise the government's investigation. Despite these clear admonitions, he told multiple people about the government's investigation and the fact that he was cooperating. He then lied to the FBI, telling agents that he had not disclosed the government's investigation when in fact he had.

### III. THE SENTENCING GUIDELINES CALCULATION AND THE PLEA AGREEMENT

Probation agrees with the parties' calculation of the advisory Sentencing Guidelines, as follows:

|   |   |   |
|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2C1.1(a)(1): | 14 |
| b. | Specific offense characteristics under U.S.S.G. Ch. 2 | |
|    | - More than one bribe (U.S.S.G. § 2C1.1(b)(1)) | +2 |
|    | - Payment or value of the benefit to be received in return for payment more than $550,000 but less $1.5 million (U.S.S.G. §§ 2C1.1(b)(2) 2B1.1(b)(1)(H)) | +14 |
|    | - High-level public official (U.S.S.G. § 2C1.1(b)(3)) | +4 |
| c. | Adjustment for obstruction of justice (U.S.S.G. § 3C1.1) | +2 |
| d. | Acceptance of Responsibility: | - 3 |
| e. | Total Adjusted Offense Level: | 33 |

Probation has determined that Nuru has zero criminal history points and falls within Criminal History Category I. With an Adjusted Offense Level of 33 and Criminal History Category of I, Nuru's advisory Guidelines range is 135 to 168 months' imprisonment. The PSR recommends a total sentence of 96 months' imprisonment, a $35,000 fine, three years of supervised release, and a $100 special assessment.

In the Plea Agreement, the government agreed to recommend a below-Guidelines sentence of no more than 108 months. Nuru agreed to forfeit any interest he has in the property identified in Paragraph 11 of the Plea Agreement, the two properties which comprise his Stonyford ranch. In addition, Nuru has agreed to administratively forfeit the John Deere tractor and related accessories he received from Hernandez, Varela and Gilmore, and the Rolex watch he received from Kong.

## IV. DISCUSSION

### A. Legal Standards

The Court should impose a sentence sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also* 18 U.S.C. § 3553(a). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the advisory Guidelines. *Id*.

After determining the appropriate advisory Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness considering the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93. Under Section 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) The need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4) The need for the sentence imposed to protect the public from further crimes of the defendant; and

(5) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### B. Sentencing Recommendation

The United States recommends that the Court impose a sentence of 108 months' imprisonment, three years of supervised release, and forfeiture. The United States further agrees with Probation's recommendation of a $35,000 fine.

#### 1. The nature and circumstances of the offense

Nuru was the quintessential grifter, using his position at DPW to enrich himself in a multitude of ways. For at least twelve years, he traded official acts, or the promise of his influence, for personal benefits in the form of cash, construction work, travel, meals, and gifts. Nuru's criminal activity dates back to his time as Deputy Director of DPW, when contractor Walter Wong did work for free on his

U.S. SENTENCING MEMORANDUM    6
21-CR-0490 WHO

home in San Francisco in 2008. It continued unabated after he became Director of DPW, one of the most powerful positions in San Francisco, and until his arrest in January 2020.

Nuru's ranch property in Colusa County, shown in the photos below, is truly a monument to his grifting:





Multiple City contractors, most of whom have now pled guilty to bribery, provided the cash, goods and services to buy the property, build and furnish the home, and develop the surrounding property. Nuru laundered some of the bribes he received by giving cash to Zuniga to pay the monthly mortgage on one portion of the property for approximately six years. Multiple contractors including Walter Wong, Balmore Hernandez, Alan Varela, and Bill Gilmartin provided workmen and equipment to help build the house and improve the property. Wong also gave Nuru furniture from China, which he shipped back to the United States and sent up to the ranch. City contractor Nick Bovis provided thousands of dollars in free appliances for the ranch. City contractor Florence Kong helped install an iron fence on the property. City garbage company Recology paid to deliver a substantial quantity of free soil to the ranch. Varela, Gilmore and Hernandez gave Nuru a $40,000 tractor and accessories to do work on the ranch.

When the metaphorical walls finally came crashing down on him after his arrest in January 2020, Nuru immediately agreed to cooperate. He then told multiple people about the government's investigation. In so doing, he caused incalculable damage to the investigation—tipping off potential subjects and targets and jeopardizing the availability of evidence. He then brazenly lied about what he had done to the FBI.

The length and breadth of his conduct, including his obstruction of the government's investigation, warrants a substantial sentence.

### 2. The history and characteristics of the defendant

As a public official, Nuru was well aware that he was engaging in criminal activity. During the same time period that Nuru was taking bribes from contractors, his City Hall colleague San Francisco Supervisor Ed Jew, San Francisco's State Senator, Leland Yee, and former San Francisco School Board President Keith Jackson, were all arrested, convicted, and sentenced for very similar conduct. In October 2008, a few months after Walter Wong did work on Nuru's home in exchange for future City business, Ed Jew pled guilty to extorting money from small businesses in the Sunset District who were seeking assistance with permit issues. Jew was sentenced in 2009 to 64 months in prison. In April 2014, Leland Yee, Keith Jackson and a number of others were indicted for a variety of racketeering schemes, one of which involved honest services wire fraud by Yee and Jackson. By that time, Nuru was

accepting bribes from at least Wong, Hernandez, Varela, Gilmartin, and Recology in return for official actions, and laundering some of those bribes through Sandra Zuniga. In July 2015, not long after Recology hired Nuru's son at Nuru's request, Yee and Jackson pled guilty to one count of racketeering, admitting that, among other things, they had engaged in a scheme to solicit bribes in return for votes. In February 2016, Hernandez, Varela and Gilmartin's lengthy effort to bribe Nuru in return for his assistance in getting their asphalt plant hit a major milestone, when the SF Port Commission formally adopted an exclusive negotiation agreement with their joint venture—and literally one day later, Yee was sentenced to 60 months in prison and Jackson was sentenced to 108 months in prison. Nevertheless, Nuru continued to solicit bribes in return for official actions for four more years. It is astonishing that Nuru could watch this happening around him and still proceed with his criminal activity, undeterred.

Further, Nuru engaged in this activity due to his own life choices. He came from a stable home, the child of academics. He got a college degree. After he came to City government he was well-compensated; in 2011, the year he transitioned from Deputy Director of Operations to Director of DPW, he made approximately $192,000.[7] By the time he was arrested in early 2020, he was making $278,586 a year.[8] Yet he wanted more—the ranch, the Rolex, luxury international vacations, envelopes of cash, the splashy holiday parties for City VIPs. Nuru wasn't forced into criminal activity by circumstance. He was just greedy.

The government acknowledges that Nuru did engage in positive efforts on behalf of the City. Even while he was engaging in criminal activity, he appeared dedicated to his official duties as Director of DPW, where he earned the nickname, "Mr. Clean" for his efforts to literally, if not metaphorically, clean up San Francisco. This was, however, his job. It certainly does not differentiate him from other criminals who can simultaneously commit crime and still be productive members of society in other ways. The court should view his good works accordingly. *See United States v. Serafini*, 233 F.3d 758, 773 (3rd Cir. 2000) ("Conceptually, if a public servant performs civic and charitable work as part of his

---

[7] *See* https://transparentcalifornia.com/salaries/search/?q=mohammed+nuru#google_vignette, last visited August 14, 2022.

[8] *Id*.

daily functions, these should not be considered in his sentencing because we expect such work from our public servants.").

### 3. Need for the punishment to reflect the seriousness of the offense, promote respect for the law, and provide just punishment

Nuru engaged in a pay-to-play scheme with multiple contractors in the City of San Francisco for at least twelve years, inflicting both real and existential harm on the City. He should receive a substantial sentence to reflect the seriousness of his offense, promote respect for the law, and provide just punishment for his crime.

Nuru abandoned his fiduciary duty to the citizens of San Francisco and subverted the competitive bidding process for DPW contracts in service of his own personal interests. In order to reward the contractors who paid him off, Nuru provided insider information to help them prepare winning bids, allowed them to structure RFPs to favor their businesses, and at times bypassed the competitive process altogether to award bids through DPW's emergency contracting process.

Nuru also tampered with witnesses and materially harmed the government's ongoing investigation into public corruption in San Francisco. For a period of approximately eleven days after he was arrested in January 2020, he roamed free in the City, tipping off subjects, targets and witnesses about the investigation and his own cooperation. He then lied to the FBI about what he had done. The government is unable to adequately measure the damage Nuru caused by obstructing the government's investigation.

Finally, Nuru's extensive, ongoing corruption did untold damage to the public's trust and confidence in their government. Nuru's exploits, and the ensuing indictments, guilty pleas, resignations, and investigations into his and others' conduct at San Francisco City Hall, have been front page news since January 2020. A substantial sentence would appropriately punish Nuru and send a message that corruption at City Hall causes real and lasting harm to the City and its institutions. *See United States v. Ganim*, 2006 WL 1210984, at *5 (D. Conn. May 5, 2006) ("Government corruption breeds cynicism and mistrust of elected officials. It causes the public to disengage from the democratic process because. . .the public begins to think of politics as 'only for the insiders.' Thus corruption has the potential to shred the delicate fabric of democracy by making the average citizen lose respect and trust in elected

officials and give up any hope of participating in government though legitimate channels.").

### 4. Need for the sentence to afford adequate deterrence to criminal conduct

As noted above, San Francisco has experienced other public corruption scandals. Yet the sentences imposed in those cases did little to deter Nuru from his conduct. A substantial sentence would send a message to other public officials that using their office for their own personal benefit will result in significant jail time. It also sends a message to the public that the courts and the government take this conduct very seriously and that nobody should simply accept this kind of criminal activity from their public officials. "We need not resign ourselves to the fact that corruption exists in government. Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable. The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences. Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all—not only to the average citizen, but to all elected and appointed officials." *United States v. Spano*, 411 F.Supp.2d 923, 940 (N.D. Ill. 2006), *affirmed*, 477 F.3d 517 (7th Cir. 2006).

### 5. Need to avoid unwarranted sentence disparities among similarly situated defendants

Courts have rightly imposed substantial sentences on public officials who abuse their positions of public trust. In order to avoid unwanted sentencing disparities, the Court can look to other, broadly similar public corruption cases involving officials in high-level public trust positions around the country. However, those cases, including those in this district, don't easily compare to the sheer length and breadth of Nuru's conduct, coupled with his obstruction of justice.

As described above, most of those who bribed Nuru have already pled guilty, but only two have been sentenced. Those sentences—a year and a day for Florence Kong, and two years for Alan Varela—certainly set a floor, but they're not sufficient bases for comparison with Nuru, a trusted public official who abused his office. When the Sentencing Commission amended the Guidelines in 2004 to

increase the base offense level for public officials who engage in corruption, they noted that higher base offense levels for public officials were appropriate because "offenders who abuse their positions of public trust are inherently more culpable than those who seek to corrupt them, and their offenses present a somewhat greater threat to the integrity of governmental process." U.S. Sentencing Commission, Amendment 666, *available at* https://www.ussc.gov/guidelines/amendment/666.

Judges in this district imposed similar sentences on the former San Francisco officials discussed above, State Senator Leland Yee (60 months for racketeering, which included honest services fraud) and Supervisor Ed Jew (64 months for extortion), but those cases also don't fully capture the scope of Nuru's conduct. Nor did they appear to have any deterrent effect on Nuru.

The government recommends that the Court impose a substantial sentence which would reflect the nature and seriousness of the offense, and deter Nuru and others from abusing their public offices, and the trust of the public, for personal gain.

## V. CONCLUSION

The United States respectfully requests that the Court impose a total sentence of 108 months imprisonment, three years of supervised release, a $35,000 fine, and forfeiture as described in the plea agreement.

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

Dated: August 18, 2022        */s/ Alexandra Shepard*

ALEXANDRA SHEPARD
Assistant United States Attorney