MILES EHRLICH (Bar No. 237954)
miles@ramsey-ehrlich.com
KATHARINE KATES (Bar No. 155534)
katharine@ramsey-ehrlich.com
RAMSEY & EHRLICH LLP
803 Hearst Avenue
Berkeley, CA 94710
(510) 548-3600 (Tel)
(510) 291-3060 (Fax)

*Attorneys for Defendant Mohammed Nuru*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.: 3:21-CR-00490-001-WHO |
| Plaintiff, | **DEFENDANT MOHAMMED NURU'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE** |
| v. | |
| MOHAMMED NURU, | |
| Defendants. | Date: August 25, 2022 |
| | Time: 1:30 pm |
| | Courtroom: 2, 17th Floor |
| | Hon. William H. Orrick |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................... 1

II.     BACKGROUND ................................................................................. 3

      A.      Early life and raising five children as a single father ................................. 3

      B.      Mohammed opened his home to those in need ........................................ 4

      C.      Mohammed served as the family patriarch. ........................................... 4

      D.      Mohammed has repeatedly created opportunities for the
disenfranchised and underserved ..................................................... 8

           i.      SLUG – 1990-1999 ......................................................... 8

           ii.      Public Works – 2000-2020 ............................................... 9

      E.      Mohammed created change through partnerships with community
organizations. ............................................................................ 10

III.    OFFENSE CONDUCT ...................................................................... 11

      A.      Mohammed takes full responsibility for his breach of the public trust ........ 11

      B.      The Recology relationship differed from the other offense conduct in
the plea ................................................................................... 15

IV.    COOPERATION .............................................................................. 17

V.     LEGAL STANDARD AND GUIDELINES RANGE .................................... 19

VI.    UPDATE AND CORRECTIONS TO THE PSR ....................................... 20

VII.   THE SECTION 3553(A) FACTORS ..................................................... 21

      A.      The circumstances here—including Mohammed's true remorse,
acceptance of responsibility, and imperfect but still important
cooperation—warrant leniency. ..................................................... 21

      B.      Mohammed has helped "the least among these" throughout his life ........... 23

           i.      Mohammed created programs that bettered the lives of
disenfranchised individuals ............................................. 23

           ii.      Mohammed reaches out to those in need, providing shelter and
a helping hand ............................................................. 24

           iii.     As a single father, Mohammed supported his family, providing
a loving environment and has served as the family patriarch to
the extended Nuru family ................................................ 25

1    iv.    Mohammed still gives back to the community ..........................26

2    C.    The sentencing goals of just punishment and the need to address
         medical conditions.................................................................................26

     i.    Mohammed will suffer substantial collateral consequences ....................26

     ii.    Mohammed's tenuous health is likely to negatively impacted
          during incarceration.................................................................................28

   D.    A term of three years will provide adequate specific and general
         deterrence. ............................................................................................29

   E.    A three-year sentence is proportionate to sentences in related cases and
         those in similar honest services fraud cases ..........................................29

VIII.    CONCLUSION ..............................................................................................32

# TABLE OF AUTHORITIES

## CASES

*Gall v. United States*, 552 U.S. 38 (2007) ..................................................................... 19

*Kimbrough v. United States*, 552 U.S. 85 (1997) ........................................................... 19

*Koon v. United States*, 518 U.S. 81(1996) ..................................................................... 19

*Rita v. United States*, 551 U.S. 338 (2007) .................................................................... 23

*United States v. Abramoff,* D.C.D.C. Case No. 1:06-cr-00001-ESH ............................ 30

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) .................................................... 19

*United States v. Giri*, E.D.Va., Case No. 1:21-cr-00196-TSE. ...................................... 31

*United States v. Giusti*, N.D.C.A., Case No. 3-20-71664 MAG .................................... 12

*United States v. Gross*, C.D.C.A. Case No. 8:18-cr-00014-JLS. ................................... 31

*United States v. Mohamed*, 459 F.3d 979 (9th Cir. 2006) .............................................. 19

*United States v. Ney*, D.C.D.C., Case No. 1:06-cr-00272-ESH-1 .................................. 30

*United States v. Schoenfeld*, E.D.C.A. Case No. 2:20-cr-00150-KJM. .......................... 31

*United States v. Stewart*, 590 F.3d 93(2nd Cir. 2009) ................................................... 26

*United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) ............................................ 19

## STATUTES

18 U.S.C. § 1791(d)(1)(F) ............................................................................................... 28

18 U.S.C. § 3553(a) ............................................................................................. 19, 21, 23, 26

18 U.S.C. §§ 1343 ........................................................................................................... 19

18 U.S.C. §3553(a)(2)(D) ............................................................................................... 26

## I.    INTRODUCTION

Mohammed Nuru apologizes to the people of San Francisco, to this Court, and to his family and friends for violating the public trust. Mohammed could not more greatly regret his wrongdoing as Director of the City's Department of Public Works. He knows his conduct was inexcusable. In December of 2021, Mohammed took responsibility for his corrupt behavior, pleading guilty to one count of honest services fraud. He now stands before this Court for sentencing.

When FBI agents first confronted him by surprise at JFK Airport, Mohammed did not deny his misconduct. He readily acknowledged his wrongdoing, voluntarily debriefing with the agents. Over two days—both in New York City and on a return flight home to the Bay Area—he provided the agents with valuable information about his own wrongdoing as well as his entire laptop. Back in San Francisco, he initially cooperated with prosecutors, answering more detailed questions about what he did. But, when faced with implicating others, he panicked—he disclosed the investigation to several friends whom he hoped to insulate from prosecution out of a misguided sense of loyalty. When prosecutors learned of his disclosure and confronted him, he immediately recognized the gravity of his mistake. His disclosure of the investigation destroyed his chance to obtain sentencing mitigation credit for his cooperation under a 5K1.1 plea agreement that he was in the process of negotiating with the government.

Even after losing this opportunity for a substantial reduction in his sentence and after new charges were filed, Mohammed remained committed to accepting responsibility for his misdeeds and cooperating fully with the prosecution. Moving forward from that enormously damaging misstep, he continued to cooperate with the prosecutors in their investigation by providing information about his and others' wrongdoing and answering their specific questions through repeated attorney proffers. And he did not make any effort to proclaim his innocence or fight his case; rather, he agreed repeatedly to continue the case at the government's request, without demanding an indictment or discovery. And he ultimately agreed to terms for a plea agreement that (quite understandably) provided no 5K1.1 cooperation benefit.

But Mohammed's corrupt acts—for which he has accepted full responsibility—do not represent the whole of him. Both professionally and personally, he has worked his entire adult life

to assist "the least of these." He has helped formerly incarcerated people, impoverished youth from housing projects and poor neighborhoods, and the down-and-out develop and lead productive and fulfilling lives. As the Executive Director of the San Francisco League of Urban Gardeners (SLUG), Mohammed taught at-risk and incarcerated youth how to farm, utilizing the activity as a tool to teach responsible citizenship and work habits. While at Public Works, he created programs to provide education, training, and jobs to many who would have been otherwise unable to earn a living wage. He partnered with re-entry and at-risk-youth programs to improve San Francisco's most neglected neighborhoods.

In his personal life, Mohammed has also helped people in need, welcoming those who were struggling and in need of shelter into his home and providing a helping hand.

Throughout, Mohammed has served as the patriarch in his own family. After his ex-wife became addicted to drugs and was declared unfit to care for their children, Mohammed raised five children (three of whom he had with her) as a single parent. Indeed, Mohammed adopted his ex-wife's son from an earlier relationship when Child Protective Services removed him from her care and placed him in a foster home. As a father, he has sought to create a loving and healing environment. And he has provided for his children's education. Now, they are young adults and he continues to support them emotionally and financially. He also helps care for his elderly parents, who are in their eighties.

Mohammed has done all this while facing his own serious personal health issues, ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

During this case, Mohammed has continued to contribute to his community. Among other things, he currently volunteers at the Candlestick Point State Recreations Area and helps with clean-up efforts there. Mohammed also spent the summer teaching youth in the community how to repair and ride bicycles. To stay busy and useful during the height of the pandemic, he also regularly volunteered at the San Francisco Food Bank.

Mohammed recognizes that his corrupt conduct deserves a serious sanction. A sentence of 36 months in prison and the forfeiture of his property in Lodoga, California—coupled with the probable collateral forfeiture of his city pension—will provide just and appropriate punishment, punishment that is "sufficient" but "not greater than necessary" to fulfill the statutory purposes of federal sentencing under 18 U.S.C. section 3553(a). A three-year prison sentence will reflect the severity of his offense, but at the same time account for Mohammed's cooperation with the government and also the significant collateral consequences his conduct has caused, including the impending loss of his pension, the forfeiture of his Lodoga property, and his negligible job prospects upon release. Further, such a sentence will recognize Mohammed's precarious health and the reality that his diabetes and heart condition put him at greater risk for severe complications from Covid-19 while in custody. A three-year sentence will also be proportionate to those already sentenced in related cases, and to sentences in other honest-services-fraud matters, while still deterring other public officials from engaging in similar misconduct. Finally, the combined term of incarceration and forfeiture of the Lodoga property is sufficient punishment—under these circumstances a fine is not necessary.

## II.     BACKGROUND

### A.     Early life and raising five children as a single father

Mohammed was born in November 1962, in Bristol, England. At the time, his father—a native of Nigeria—was studying veterinary medicine in Bath, where he met Mohammed's mother, who is British. Mohammed is the first-born child and has three siblings.

The family returned to Nigeria when Mohammed was two-years-old. Though Mohammed's father was a professional, the family was middle class, not wealthy. Still, Mohammed had a happy childhood, in which his father taught him to farm and care for animals. From a young age, Mohammed delighted in gardening and connecting with the land.

By 1967, the Nigerian Civil War had broken out. The war continued until early 1970. In Mohammed's neighborhood, military checkpoints abounded and sirens filled the air. His father served in an ad-hoc police force, which helped keep the peace. Later, his parents moved to the United States, where his father attended Kansas State University. His father subsequently obtained

a veterinary degree at UC Davis. While his siblings traveled with their parents, Mohammed remained in Nigeria at boarding school and spent holidays with relatives.

A friend from pre-college, Osa Odiase, recounts that, even in his teenage years, Mohammed demonstrated his inclination to help others: "Mohammed would bring homeless kids home, feed them, clothe them and give them a place to sleep in their boys' quarters for a few days." (Ex G, MNURU_0118).[1] It is a theme that has recurred throughout Mohammed's life.

When it was time for Mohammed to attend college, he came to the United States and enrolled in a design program at Kansas State University, where he discovered a love of landscape architecture. Graduating in 1987 after completing a five-year program, he received the National Undergraduate Student Design Award from the American Society of Landscape Architects for the design of a ranch property.

After college, Mohammed entered the workforce. His first job was with a landscape architecture and engineering firm in Sacramento. In 1990, Mohammed came to the Bay Area and joined SLUG—the San Francisco League of Urban Gardeners—and soon became its director.

During his early post-college years, Mohammed met Raina Young. They married in 1989. Raina had a two-year old son from a previous relationship, Jamil Randy, who came to live with them. Raina and Mohammed had three children of their own over the next four years—Hameed, Samira, and Jamila. Raina, unfortunately, became addicted to controlled substances and alcohol. Sadly, at times, she abused the children and left them alone unsupervised. Mohammed realized that he could no longer trust his wife. Due to her substance abuse, Raina could not function as the children's mother. Mohammed and Raina split as a result. He was devastated.

After the divorce, Mohammed gained full custody of his children, and contact with Raina ceased. But because Mohammed was not Jamil's biological father, Raina still retained custody of Jamil. When she could not care for him, Jamil was placed in foster care. Eventually, however, Child Protective Services found Mohammed, who then formally adopted Jamil after learning he was in foster care. Jamil was able to reunite with the rest of the family. As Jamil explains:

---

[1] The letters in support of Mohammed Nuru are attached as exhibits to this sentencing memo and are referenced by exhibit letter and the bates number.

Because my father did not have legal rights at that period in time I ended up back in the care of my mother who at the time was struggling with alcohol and drug abuse. Eventually, my mother was arrested and I was given to the state and then into foster care services. After discovering my location and conditions, my father went through the necessary procedures to formally adopt me to which I officially changed my name to Jamil Nuru. While in his care I have attended the best schools in our community and have had the opportunity to live in Africa for an extended period of time. He has shown the importance of service before self and leadership by example.
(Ex. B, MNURU_0005).

In addition to his three children with Raina Young, in December 1997 Mohammed had another son, Muhktar, with Michelle Rink Walker. Though Mohammed and Michelle are friendly, Muhktar has lived with his father from a young age.

As a result, for more than twenty years, Mohammed, as a single father pursuing his own career, has raised five children in San Francisco's Bayview-Hunters Point neighborhood. After running SLUG for almost ten years, he joined Public Works in 2000 as its Deputy Director. Later, in 2011, he was promoted to Director of Public Works.

Even with his busy professional schedule, Mohammed has always been a devoted father. He created a safe, loving, and healing environment and ensured that all his children received a good education. As his daughter Samira explains:

Despite the challenges that were going on during that time in my mother's life, I feel that my dad did everything in his power to make sure us children were safe and able to have as normal of a childhood as possible . . . I recall having a great childhood; one that was full of closeness with my siblings and father … [he] taught us skills such as how to ride a bike and fishing and frequently brought us out into nature and on site to his gardening projects where we could be adventurous. (Ex. B, MNURU_0006).

Eventually, Mohammed met Sandra Zuniga, who became a life partner and a matriarchal figure in the Nuru family's life.

In approximately 2010 and 2013, Mohammed acquired property in Colusa County, a sparsely populated, agricultural area north of Sacramento where he could pursue his love of farming, escape from city life, and establish a place of respite for himself, his family, and his friends.

## B. Mohammed opened his home to those in need

From 2000 onward, Mohammed made his Bayview-Hunters Point home a warm and welcoming place for family, friends, and those who needed a place to stay. He acted as a guardian and mentor to his nephews while they studied in the United States. (Ex. B, MNURU_0010). One of his nephews describes life at the Nuru home:

> My uncle was always there to provide a safe space for me during the school breaks—you'd find several friends or acquaintances in his home, often people without a place to call home, and he did it all without ever asking for anything in return. (Saddiq Nuru, Ex. B, MNURU_0014).

He welcomed individuals who were struggling and had no place to go. For example, Mohammed met Olusoga Odufalu by chance while Olusoga was barely earning enough to make ends meet. Olusoga was struggling after his wife had died and his business had gone under. After Olusoga qualified for a city job, Mohammed offered him shelter and encouragement while he got back on his feet. Olusoga stayed with the Nuru family for more than a year. He explains:

> I lost my wife to cancer, lost my home and business, [Mohammed] commiserated with me and encouraged me to lift myself up and find the message in the mess . . . he offered me a free accommodation at his house because of the hardship I was facing in my finances. His diligence, humility, compassion for people in general especially people in need of a second chance in life manifested [to me]. (Ex. D, MNURU_0055).

Mohammed also offered his home to students who needed support. One student, Jamey Flowers, was close to failing out of the architecture program at Kansas State University when one of Mohammed's former professors suggested that Jamey contact Mohammed for advice. While on an extended break from school, Mohammed gave him a place to stay and spoke to him about the determination to succeed: "I thought I would be staying in an extended stay motel, but Mr. Nuru opened his home to me for free . . . [he] showed me that success could be achieved even if the chips were stacked against you." (Ex. F, MNURU_0109). And Mohammed reaches out to friends and neighbors in smaller ways too. As one friend states: "[H]e was here for me and our family during the illness and death of my spouse of sixty-seven years." (Emma J. Egerly, Ex. G, MNURU_0119). Another says: "Whenever my grandmother needs help, no matter what it is, he has been right there." (Emma Johnson Ex. G, MNURU_0122).

### C. Mohammed served as the family patriarch.

Throughout his life, Mohammed has embraced his role as the eldest son and family patriarch. By his continuous support of others, he has served as a model for family and friends. His brother, Dr. Hameed Nuru, a veterinarian and the Director of the Africa Global Office for the United Nations Food Programme, attributes his own academic and professional success to the encouragement he received from Mohammed: "This was only possible through Mohammed being a role model for me. Something he has subsequently shown and continues to show to others." (Ex. B, MNURU_0009). A life-long friend from Nigeria states: "He is the first to congratulate you when doing well but also the first to reach out when you are struggling." (Dr. D.A. Kyari, Ex. G, MNURU_0117).

Now, Mohammed's children are all adults, the youngest having just graduated from college. Mohammed continues to support all his children in varying degrees. The two oldest live in Arizona. Jamil, the oldest son, is raising two children on his own and ███████████████████

█████████████████████████████████████████████████████████████

Mohammed speaks with him frequently to provide emotional support and assists the household with small financial contributions. Hameed, the second oldest, has two graduate degrees and Mohammed pays the monthly amount toward his significant student loan debt—totaling over $100,000. The three younger children live with Mohammed. His oldest daughter, Samira, ██████

█████████████████████████████████████████████████████████████

██████. She is currently fully supported by Mohammed. His second daughter, Jamila, and her husband both live with Mohammed and welcomed their newborn daughter to the household on June 11, 2022. Jamila and her husband are partially supported by Mohammed in this arrangement. His youngest son, Muhktar, a recent college graduate, also lives with the family and is supported by Mohammed while he looks to start his career. Mohammed also contributes to his 85-year-old mother's well-being by arranging needed medical care, procuring medical equipment, and hosting her on extended visits to San Francisco.

Mohammed has done all this while tackling his own significant health challenges, ██████

███████████████████████████████ ██ ████████████████████



**D. Mohammed has repeatedly created opportunities for the disenfranchised and underserved.**

In his professional life, Mohammed transformed the agencies he led to provide jobs, training, and educational programs to the disenfranchised and underserved. Going far beyond his job description, he created programs that allowed hundreds of individuals to earn a decent living, provide for their families, and fulfill their potential. Mohammed acted as a personal mentor and cheerleader for many, contributing greatly to the participants' success.

### i. SLUG – 1990-1999

At SLUG, Mohammed taught youth not only how to farm but also imbued in them the skills and personal qualities required to be a reliable employee. *See* Kates Decl., ¶ 10, Ex. 9. He recruited at-risk youth from Bayview-Hunters Point and met their needs by creating counseling and mentorship opportunities—all in an environment where people worked with respect and dignity. (Elisha Rochell, Ex. E, MNURU_0098). One former SLUG participant states:

> Mohammed changed my life by giving me a chance to work and become a productive citizen in my community. When I started to work for the company Mr. Nuru encouraged me to obtain my GED and to further my educational development by going back to school. Mr. Nuru out of his own time [took] us to the DMV so that we could take our test to obtain our driver's license. To sum it up, Mr. Nuru would put you through the steps to set you up for life!! (Edward Redd, Ex. E, MNURU_0099).

Another SLUG participant explains that Mohammed "gave me the opportunity to learn under his guidance and trusted me to do my job well." (Julie Rivera, Ex. E, MNURU_0100). A

former SLUG apprentice also attests to learning lifelong skills she gained from Mohammed: "I am 43 years old & I am still utilizing the skills acquired while working with Mo at SLUG." (Raichele Jackson, Ex. E, MNURU_0101). Mohammed also taught individuals the importance of building community through the workplace—establishing lifelong relationships along the way. (Terrell Smith, Ex. E, MNURU_0104-05).

In addition, Mohammed expanded the SLUG program to include detainees at the San Francisco juvenile detention facility, Log Cabin Ranch, and also to reach numerous formerly incarcerated adults. As one former SLUG volunteer explained:

> Mohammed's crews were the people we do not see. Or more correctly stated, the people we choose not to see—those written off because of substance addiction, those rendered homeless by circumstances both within and beyond their control, those newly released from jail who were trying to start a new life but simply could not land a job because no one wanted to hire them on account of their records, these were the people Mohammed invested his time, energies talent and skills in. So at SLUG Mohammed offered job training skills, and more important, he also provided substance abuse counseling, and life management skills. (David Unongo, Ex. C, MNURU_0024).

And Mohammed modeled the behavior he sought from employees: "He would be the first to be on site and the last to leave assisting very many underserved persons achieve capacity." (Kola Thomas, Ex. E, MNURU_0103).

### ii. Public Works – 2000-2020

After his success at SLUG, Mohammed brought the same vision of helping the community to his position at Public Works. Again, going far beyond his basic job description, he created apprenticeship and job-training programs, which enabled those in underserved communities to enter the city workforce and learn the skills they needed to advance. He also created education partnerships so that employees could earn college degrees and reach their full potential. These programs Mohammed has led have helped countless individuals. Below are a few select testimonials among many:

> Maurice Sullivan, who works for DPW states: "When we first met, I was homeless, unemployed and lacking hope. Mohammed showed me a future and gave me the chance to provide for my family." (Ex. D, MNURU_0056).

Nicole Cook describes the opportunities she received: "I was fortunate to be selected to the [apprenticeship] program, this gave me the opportunity to provide for my sons . . . Mr. Nuru was a mentor and a leader that pushed me to excel and acquire knowledge to better my future. . . . He is compassionate and always helps others." (Ex. D, MNURU_0057).

DiJaida Durden explains how she benefitted from DPW's educational partnerships: "I went back to school for five years and obtained three degrees, Associates in Sociology, Associates in Human Behavior, and a bachelor's in business. Mr. Nuru's support was unconditional . . . [he] mentored me by being a positive influence, bringing out the best in me, and inspiring me to focus on the details of the city's need." She is now the Deputy Director for Operations at DPW. (Ex. D, MNURU_0058).

Adelia Nycole Whitfield describes her experience in the apprenticeship program: "It was a two-year program where we got to learn various trades like welding, gardening, and overall construction. Once I completed the program, I was hired on as an 'as-needed' general laborer. That's when Mohammad encouraged me to take training classes to further my career. He was always the coolest easy-going boss ever; you could talk to him about anything. Some would say like an uncle, or father-figure." (Ex. D, MNURU_0059).

Corey Jackson explains how he was aided by Mohammed: "During an adverse period in my life, I was in need of a second chance. Mr. Mohammed Nuru gave me an opportunity to work for the department of public works in San Francisco. I started at the bottom of the totem pole sweeping the street on the blocks of Potrero Street in SF. I took steps of growth to Laboring Apprentice, as needed Laborer, and permanent Laborer. I am now a permanent General Laborer Supervisor I and have even more room to grow in the future. I know I am one of the many people living a productive life with a bit of help from Mr. Nuru." (Ex. D, MNURU_0061).

Further, employees have been inspired by Mohammed's compassion, recounting that Mohammed took his personal time to visit sick employees in the hospital and at their homes. (Ex. D, MNURU_0066). Peter Lau, an Assistant Superintendent, states that Mohammed is "adored and respected" by many at Public Works because he always wanted to see people succeed: "[H]e gave people a chance, even if they made questionable decisions in the past." (Ex. D, MNURU_0060).

E.     Mohammed created change through partnerships with community organizations.

Mohammed has continuously reached out to work with community organizations to create positive change for the underserved and at-risk, both in his role at Public Works and in his private life. For example, while at Public Works, Mohammed helped develop and improve the Civics

Group/Pit Stop program with Dwayne Cooks and DeJuan Lewis.  The program served the formerly incarcerated and was designed to "lower recidivism by providing an opportunity to assist men and women who are qualified to work but fac[e] barriers with finding initial employment," many of whom "to this day have maintained employment."  (Ex. C, MNURU_0021). Mohammed also oversaw a partnership between Public Works and the SF SAFE program to address graffiti tagging in city neighborhoods.  SF SAFE worked with youth volunteers but relied upon the expertise and assistance from Public Works to achieve success. (Michael Wong, Ex. C, MNURU_0023).  Further, Mohammed partnered with Lazarus House, an organization that aided the residents of the Alice Griffith Housing Projects.  Stephanie Hughes, its founder, explains that these programs provided significant tangible benefits to the community:

> "Mr. Nuru offered volunteer opportunities as well as jobs, during the time of Mr. Nuru's services and partnership with us at least 80% of the crime dropped.  Over a period of time and with the consistency, and mentorship of Nuru, many of the youth and young adults have purpose, hope and a brighter future." (Ex. C. MNURU_0022).

In his private life, he has participated in community groups seeking to make his own neighborhood a safer and healthier environment, including the Bayview Heights Community Response Team and the Candlestick Point Neighborhood Watch and Crime Prevention Committee. (Osafran Okundaye, Ex. C. MNURU_0040, Shirley Moore, Ex. C., MNURU_0027).  Mohammed has also used his expertise to build a vegetable and fruit tree garden at Castlemont High School in East Oakland with another farming colleague. (Eric Edgerly, Ex. G, MNURU_0120).  Further, he is active in the Nigerian American community, lending his time and expertise to programs designed to empower and develop that community. (Veronica Ufoegbune, Ex. C, MNURU_0031,Gboyega Aladegbami, Ex. C, MNURU_0053).

## III.    OFFENSE CONDUCT

### A.    Mohammed takes full responsibility for his breach of the public trust

Mohammed has fully and honestly owned his wrongful conduct.  He knows he acted corruptly and dishonestly and is truly remorseful for having violated the public trust when he accepted payments, gifts, and services from individuals and entities that contracted with the City in

exchange for using his power and influence for their benefit. He accepts full responsibility for his corrupt acts.

Without minimizing his misconduct, it is important to understand its full context. In that regard, at the start, Mohammed rationalized accepting the renumeration because initially the individuals providing the payments, services, and other gifts were his good friends, akin to family. Even though Mohammed knew it was wrong to accept recompense from contractors doing business with Public Works and the City, in the initial stages, he rationalized it to himself as accepting gestures of friendship. The key figures, Walter Wong and Balmore Hernandez, were mutual friends of both Mohammed and Ed Lee, the deceased former mayor, whom was a mentor and good friend to Mohammed. Walter, a long-time contractor for the city, hosted numerous dinners that Mohammed, Ed, and Balmore attended together. Indeed, Walter also spent much time at Mohammed's house and knew his family well. He was a particular favorite of Mohammed's mother. When Walter installed a gate at Mohammed's San Francisco residence in 2008 without charge, Mohammed rationalized to himself that Walter was merely making a magnanimous gesture—even though he knew that Walter had contracts with the City. And, at the start, Mohammed excused the trips he took with Walter as merely friends travelling together—even though Walter footed the bill.

Likewise, Balmore—who worked at Public Works before becoming a city contractor—had been very close with Mohammed. Their two families spent time together, often celebrating family events and taking trips. Again, Mohammed rationalized the expensive dinners that Balmore and his group provided as a mere favor from a friend. In the initial stage, there was no explicit agreement that Mohammed would help with a specific contract—no express *quid pro quo*. Nonetheless, there was an unspoken understanding that Mohammed would use his influence to help both Walter and Balmore when he could, and when the occasion presented itself. For Walter, at the early stage, this meant assisting with the speed of the process for approval of his city projects—but, it must also be said, this assistance never included circumventing complete and proper inspections or obtaining approvals for projects that did not fully meet the building codes.

The situation devolved further after Mohammed purchased unimproved land in Lodoga, California, an unincorporated area adjacent to Stonyford, in Colusa County. Lodoga is in a remote area northwest of Sacramento that abuts the Mendocino National Forest. Mohammed had visited the area because he had friends who lived there. He enjoyed fishing in the reservoir, as well as the peace and tranquility away from city life. Around 2010, when a parcel came up for sale, he bought this property from the owner. He later purchased a second, adjoining parcel at a foreclosure auction in early 2013. (Together, the "Lodoga property.") This undeveloped parcel had access to the reservoir. For the first several years, he used the property as a camping site while he undertook improvements himself. Many weekends, he would go up with family and friends, including Balmore Hernandez, to clear the land and plant trees, relax and go fishing in the reservoir.

But when Mohammed sought to finance a prefabricated home to place on the second parcel, he learned that the land had a title issue. Although Colusa County gave written assurances that the title was clear, he still could not obtain bank financing for the prefabricated home. Hitting a dead end, he undertook to build a house from scratch himself—a three-bedroom ranch house that nonetheless embodied his dream of a place of refuge for family and friends, to which he would one day retire. Mohammed worked with an architect to draw up plans for the house and obtained permits from the county. Soon Mohammed found that, in trying to build a house on his own, he was in far over his head. He hadn't realized how large an undertaking it was to build even a modest house from scratch on an undeveloped parcel. It was beyond his personal skills.

Unable to qualify for construction financing, Mohammed turned to Balmore to assist him. Over time, Balmore and his group, including William Gilmartin and Alan Varela, provided funds, labor, and materials for improvements to the land and the construction of the house as he confronted the various stages of home-building. Mohammed also enlisted Walter, who eventually sent his team of laborers to handle certain aspects of the construction and to fashion an outbuilding. Later, Walter purchased furniture for Mohammed for the house on a trip to China. William Gilmartin eventually provided a tractor. In addition, Mohammed received assistance from Florence Kong and Nick Bovis, who provided a gate and household appliances, respectively, all with no charge to Mohammed.

There is no dispute whatsoever as to this critical point: By the time Mohammed was accepting this valuable remuneration to help build a house and improve the property—both in straight-forward payments from Balmore's group and in labor and materials from Balmore and the others—Mohammed could no longer rationalize any of this as a mere gesture of friendship. By this point, Mohammed had agreed to help Balmore Hernandez, Walter Wong, and Nick Bovis with specific city contracts. He understood that these individuals provided remuneration in exchange for his influence. Mohammed knew that this was wrong, indeed a betrayal of his public responsibilities, but he was driven by the desire for something he could not afford. He developed an unhealthy ambition to complete his house in the country, where he could garden and fish with his family and friends and where he would one day retire.

Separately throughout this time frame, Mohammed accepted additional personal gifts from these and other city contractors—all of which, though still substantial, represented a lesser overall value than the remuneration that was connected with the Lodoga improvements. Mohammed accepted certain gifts because it was difficult to support a large family on his own in the Bay Area. For example, Walter and Florence gave him envelopes of cash at holiday times—telling him that these gifts were for his children. Walter also sent his crew to work on Mohammed's San Francisco house. Mohammed accepted these, believing that he needed extra help to house, feed, and educate his five children. Mohammed also accepted gifts that were purely extras for himself, such as a Rolex watch from Florence, travel and goods from Walter, and meals from Nick Bovis. And, as detailed in the plea agreement, Mohammed received additional cash gifts and meals from other contractors doing business with the City. Despite his efforts at rationalization, Mohmmed knew that accepting this remuneration was corrupt and a fundamentally dishonest way of conducting himself as the Director of Public Works. Over time, Mohammed had come to lose his moral and ethical footing—though he knew it was wrong, he nonetheless agreed to use his influence for the benefit of these contractors in exchange for labor and materials for his Lodoga property, as well as cash and other valuable gifts.

As set forth in the plea agreement, the total value of the benefits Mohammed received was more than $550,000.  Mohammed takes full responsibility for his wrongful conduct in accepting these payments and feels deep remorse for his illegal actions.

**B.      The Recology relationship differed from the other offense conduct in the plea**

In addition to the above, the plea agreement describes Mohammed's relationship with Recology.  But the relationship with Recology differs from the offense conduct described in the preceding section for several reasons.  First, unlike the compensation Mohammed personally received from the city contractors discussed above, Mohammed sought the payments from Recology primarily to benefit city programs and support employees.  Mohammed did receive free soil from Recology for the Lodoga property that was for his personal benefit.  But the lion's share of the donations from Recology set forth in the plea supported a city cleaning program known as Giant Sweep.  Over a five-year period, Recology donated $150,000 per year (approximately $750,000 total) to this program—which combats litter, graffiti, and illegal dumping.  (Plea at 8:2-11).  When money was left over from those donations, Mohammed set up a fund overseen by the DPW finance department to support employee appreciation events and for covering such things as health fairs and exercise equipment for employees, Bay to Breakers entrance fees for workers, and funeral-related expenses for relatives of Public Works employees. (See Giusti complaint, ¶¶ 13-14, 74).  Mohammed approved these expenditures.  He also sought donations from Recology—approximately $60,000 over a three-year period—for an annual holiday party for Public Works staff and Recology employees.  As a result, the Recology payments for Giant Sweep and the holiday party should not be viewed as part of the remuneration received directly by Mohammed for his own personal benefit.

Second, unlike the payments from other city contractors, Mohammed did not take any specific steps to influence the rates paid by the City to Recology, and nowhere in the Recology Deferred Prosecution Agreement or in Mohammed's plea does it indicate that he did.  Rather, Mohammed generally gave favorable consideration to Recology in their dealings with the City.  Accordingly, the Deferred Prosecution Agreement entered by Recology does not include any

restitution amount—no calculation of any surcharge to be recouped based upon a purported increased rate resulting directly or indirectly from the payments made by Recology for the Giant Sweep or the Public Works holiday parties, or for other remuneration to Mohammed.

Further, the plea agreement describes how the funds from Recology were first paid to certain non-profit agencies before Mohammed authorized specific expenditures for Giant Sweep and for the holiday party. This flow of funds creates the impression of a deliberate misdirection. But, in its analysis of third-party donations to city departments, the City Controller concluded that it was a common practice in San Francisco to have third-party donations go to outside non-profit entities, known as "fiscal agents," before being used for staff appreciation and related events. The City Controller concluded further that these funds were in fact used for legitimate purposes.[2] And Mohammed never sought to disguise the payments. Indeed, at the holiday parties, on multiple occasions, Mohammed openly announced Recology's sponsorship in order to give them public recognition.

Finally, at Mohammed's request, individuals at Recology arranged for summer employment for Mohammed's son—first as a debris box painter at Recology, and then at a non-profit. But this was not a "no work" job; there is no allegation that he did not earn the money he received through his labor, nor that he was paid an inflated hourly wage.

---

[2] After the USAO filed the Information in this case, the Office of the City Controller analyzed the practice of city contractors and building permit applicants donating to nonprofits and other non-city organizations. *See* Kates Decl., Ex. 8, p. 2. It found that many city departments used non-profits and other non-city entities to support various departmental and staff appreciation programs. *See id.* at 2, 4, 9-11, 13. More importantly here, the City Controller also analyzed how the funds donated to the Parks Alliance had been used by Mohammed at Public Works. It found that, though the processes raised certain ethical issues, the funds were used for legitimate public purposes:

> Mohammed Nuru and others would direct staff to procure goods and services for staff appreciation, volunteer programs, merchandise, community support, and events from specific vendors, circumventing city purchasing controls. These purchases would then be reimbursed through Public Works subaccounts held by the Parks Alliance, a non-city organization, again outside of city purchasing rules. (page 2)
> * * *
> Although our review found instances of gifts received being spent through seemingly inappropriate processes, they appeared to generally be ***for legitimate public purposes, including staff appreciation and celebration of team accomplishments.*** (page 4).

While Mohammed acknowledges the impropriety of facilitating payments from Recology without transparent disclosure to the public, these payments are distinct from the renumeration that went to him for his own personal benefit. As such, the $750,000 Recology donated to the Giant Sweep program and the $60,000 for the holiday party should not be considered part of the value of the benefit received by Mohammed. Rather than the $1.45 million benefit indicated by Probation, this number should be $640,000. *See* PSR Sentencing Recommendation, Dkt. 109 at p. 26. Nonetheless, this does not change the applicable guidelines range.

## IV.   COOPERATION

Mohammed provided valuable information to the government that has assisted with the investigation and prosecution of this case and related cases.

In the fall of 2019, at New York's JFK airport, FBI agents confronted Mohammed. After pulling him out of the TSA line by surprise, they took him into a back room and played a recording of his own phone calls, shared other evidence from their investigation, and questioned him. More than an hour later, they requested that he accompany them to dinner—where he answered additional questions to and from the restaurant and during the meal—and then to a hotel that night before boarding a plane together with the agents the next day to San Francisco. Mohammed understood the gravity of his misconduct—he had suffered anxiety for months—and he fully cooperated with the agents over more than a day in New York and on the return flight to San Francisco. Mohammed turned over his entire laptop to the FBI and answered their questions without asking for counsel. Mohammed was forthcoming, truthful, and did not deny or minimize his conduct; indeed, he provided important information that the government used to further its investigation.

When Mohammed and the agents returned to the Bay Area, as part of discussions to resolve the matter, the government sought additional cooperation from Mohammed about others involved in the pay-to-play scheme. At the government's suggestion, he retained attorneys to help him navigate the process. He then agreed to cooperate further with the prospect of entering a cooperation plea agreement under 5K1.1. He met with the entire prosecution team to answer more of their specific questions and to discuss the prospect of further covert investigative steps he might take to further the government's investigation. But as the process unfolded, Mohammed panicked.

He had been fine with revealing what he himself had done, but when it came to implicating close friends, whom he viewed as family, he simply panicked. In the moment, he thought he could just admit his own wrongdoing but still insulate others. He foolishly disclosed the confidential investigation to his friends who were potential targets. Worse yet, later, when prosecutors questioned him about whether he had disclosed the information to potential targets, he lied. He did not know that the prosecutors had already learned that he had made these disclosures. They confronted him with the facts about his obstruction. The potential cooperation plea agreement understandably evaporated in an instant, and he was arrested. Mohammed realized that he had made a monumental mistake. He had committed another offense and had destroyed any chance to enter a cooperation plea agreement that would allow him to receive any credit towards a downward departure under Sentencing Guideline 5K1.1.

Yet, in the face of this disastrous mistake, Mohammed righted himself and recommitted himself to make amends for his wrongful acts and resolved to continue to provide information to the prosecutors, even knowing that facts he revealed could be used against him (without the protection of a 5K1.1 plea agreement) and against his friends. Over the following two years plus, Mohammed willingly assisted the government and never fought this case. Through more than five attorney proffers, he answered the government's questions and provided information about his own conduct and that of others. Over the course of the first three attorney proffers, Mohammed came clean, fully, regarding all of his corrupt actions—some of which the government had no previous knowledge of, and this new evidence of criminal conduct was incorporated into the factual basis of his plea agreement. Then moving forward, spanning months, as the government asked specific questions about other individuals whom they were investigating and seeking to prosecute, Mohammed provided all of the relevant and truthful information he had, whenever asked. Additionally, Mohammed sat for two days of questioning by the City Attorneys' office.

Ultimately, after the attorney proffers were completed, Mohammed resolved the matter without the need for the DOJ to bring an indictment, provide discovery, or litigate the case, saving substantial government resources. At the government's request to aid its continuing investigation and prosecutions, Mohammed had repeatedly waived his right to indictment and arraignment.

These continuances lasted nearly two years. During this time, he continued to maintain the Lodoga property, a task which required regular personal financial and physical commitment, even knowing that he would ultimately need to forfeit the property to the government in full.

## V.  LEGAL STANDARD AND GUIDELINES RANGE

The "overarching statutory charge" under 18 U.S.C. § 3553 to courts is to "impose a sentence sufficient, but not greater than necessary" to accomplish the statutory objectives of federal sentencing. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008)(quoting 18 U.S.C. § 3553(a)); *see also Kimbrough v. United States*, 552 U.S. 85, 101 (1997). And the Supreme Court has directed sentencing judges, in doing so, to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (*quoting Koon v. United States*, 518 U.S. 81, 113 (1996)). The applicable Guidelines range is merely the "starting point and the initial benchmark" in this process. *Gall*, 552 U.S. at 49; *Carty*, 520 F.3d at 991. And sentencing courts "may not presume" that the Guidelines range is reasonable. *Gall*, 552 U.S. at 50. The Supreme Court's decisions in *Gall* and its progeny have "breathed life into the authority of district court judges to engage in individualized sentencing," *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008)(*quoting United States v. Vonner*, 516 F.3d 382, 392 (6th Cir. 2008)(en banc)), and confirmed the power of district courts to depart from the Guidelines in appropriate cases. *See United States v. Mohamed*, 459 F.3d 979, 987 (9th Cir. 2006)("any deviation from the applicable advisory guidelines range [is] viewed as an exercise of the district court's post-Booker discretion and reviewed only for reasonableness.")

To determine the appropriate sentence, the court is directed to consider all the factors listed in 18 U.S.C. § 3553(a). These include the nature and circumstances of the offense and the history and characteristics of the defendant, the need for the sentence imposed to provide just punishment and afford adequate deterrence, the need to provide medical treatment, and the avoidance of sentencing disparities. *See* 18 U.S.C. §3553(a). Here, the parties have agreed to the following guidelines calculation for the violation of 18 U.S.C. §§ 1343 and 1346: a base offense level of 14; enhancements for the value of the benefits received, more than one bribe, high level public official,

and obstruction of justice—an additional 14, 2, 4, and 2 levels respectively; and an adjustment for the acceptance of responsibility—less 3 levels. The adjusted offense level is thus 33. Mohammed's criminal history category is I. The government has agreed that it will seek a sentence of 108 months or less. Probation recommends a sentence of 96 months. On behalf of Mohammed, the defense requests a downward variance to 36 months.

## VI.    UPDATE AND CORRECTIONS TO THE PSR

The defense requests that the Court allow an update and correction to the final PSR based on Mohammed's new medical information and an inadvertent mistake on his financial disclosure form that carried over to the Final PSR.

Specifically, the defense requests that the Court make the following additions and corrections:

- **Medical condition, ¶¶ 89-93**

- **Financial condition, ¶ 104**

*Assets*: Mohammed's financial disclosure form inadvertently left out two undeveloped parcels of land he owns in Lodoga. Neither property has a physical address. These properties are both 10 acres and are each assessed at $26,691 for tax purposes. As a result, his assets should be increased by $53,382 to include these properties.

After he completed the financial disclosure form, Mohammed has relied on savings in his personal account to meet his expenses. It now contains approximately $12,000 not the approximately $23,000 listed. As a result, his assets should be decreased by $11,000 to reflect this change.

Based on the above adjustments, Mohammed's total assets should be $2,686,998.

***Net worth/ability to pay a fine***:  Mohammed's net worth and his consequent ability to pay do not account for the forfeiture of the properties at 2803 and 2819 Lodoga Stonyford Road, in Stonyford, California.  The combined value of these properties is $855,600.  One of the properties has a mortgage of $312,550.  As a result, Mohammed will forfeit property with a net value of $543,050.  His net worth for purposes of his ability to pay a fine should therefore be reduced by the amount of this forfeiture.

Based on the above revised total assets and an adjustment for the forfeiture, Mohammed's total net worth is $804,341.

## VII.    THE SECTION 3553(A) FACTORS

### A.    The circumstances here—including Mohammed's true remorse, acceptance of responsibility, and imperfect but still important cooperation—warrant leniency

Mohammed has taken responsibility for his serious illegal conduct.  Mohammed deeply regrets violating the public trust and endeavors to do whatever he can to make things right for the people of San Francisco.  To this end, he has never fought this case or denied his misconduct.  He apologizes and makes no excuse for the corruption he engaged in.  The Court may consider Mohammed's genuine remorse, the overall value of the benefits he received, and his important— though imperfect—cooperation as mitigating factors under 18 U.S.C. § 3553(a)(1)'s direction to examine "the nature and circumstances of the offense and the history and characteristics of the defendant" in determining a sentence that is "sufficient, but not greater than necessary."

As set forth above, Mohammed initially rationalized his corrupt conduct as accepting the generosity of his close friends Walter Wong and Balmore Hernandez, whom he viewed as akin to family.  At first, Mohammed cast the dinners, travel, and gate for his San Francisco house as magnanimous gestures from friends—though there was the unspoken agreement that he would exert his influence in their favor.  Later, the situation devolved much further when Mohammed learned that he could not finance the construction of his house in Lodoga due to a title problem.  He turned to the same city contractors, Walter and Balmore, as well as others, including Florence Kong and Nick Bovis, to help him out.  Rather than give up his dream to build a refuge from city life and

his future retirement home, he accepted funds, labor, and materials to build the Lodoga house in exchange for using his influence to help these contractors. And he recognizes that he received more than the extensive assistance with improving the Lodoga property, and accepted additional remuneration in the form of gifts, cash, and meals from individuals and contractors doing business with the City. Mohammed deeply regrets this unlawful conduct and apologizes for infecting the City contracting processes with corruption.

At the same time, it is important to differentiate the Recology payments from those of other contractors. There is no dispute that the lion's share of the funds from Recology benefitted the city through the Giant Sweep program—with its goal of ridding the city of litter, graffiti, and illegal dumping—and for the holiday party for Public Works and other city employees. The remaining funds were used for staff appreciation and to support employees on an ad hoc basis—for example, funding an employee health fair, buying workout equipment, and paying burial fees for relatives of Public Works employees. *See* Kates Decl., Ex. 8 at pp. 18, slide 23; *United States v. Giusti,* Case 3:20-mj-71664-MAG, Dkt. No. 1 at ¶¶ 13-14, 74. As a result, the Recology payments primarily benefitted the City and Public Works employees, not Mohammed. In addition, there is no evidence that Mohammed corruptly influenced Recology rate increases or took any steps to do so. He does, however, acknowledge that he generally sought to benefit Recology in its relationship with the City.

Finally, when confronted by the FBI at JFK Airport in New York City in the fall of 2019, Mohammed knew that he had committed a serious breach of trust and needed to do what he could to make things right. As discussed, he provided them with documents—his entire laptop—and answered their questions without the assistance of counsel. Nonetheless, as referenced, in a panic to protect others rather than himself, he disclosed the government's confidential investigation. The disclosure was discovered, and he immediately felt the enormous consequences of his obstructive act—his potential cooperation agreement evaporated. Nevertheless, he realized that he had no one to blame but himself. And he resolved to continue to provide information to the government, further incriminating himself and others. He went on to provide additional proffers, even knowing that he had lost all possibility of obtaining a downward departure for his cooperation. And some

of the information he subsequently provided has been used against him in his own plea agreement and in the prosecution of others.

## B.    Mohammed has helped "the least among these" throughout his life

Section 3553(a) also directs the court to consider "the history and characteristics of the defendant."  In this analysis, the court may take into account "family ties, or military, civic, charitable, or public service" that are not ordinarily part of guidelines. *See Rita v. United States*, 127 S. Ct. 2456, 2473, 168 L. Ed. 2d 203 (2007)(Stevens, J., concurring)("Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, family ties, or civic, charitable, or public service are not ordinarily considered under the Guidelines.  These are, however, matters that § 3553(a) authorizes the sentencing judge to consider.")  As set forth above and below, Mohammed has lived a life of helping the disenfranchised and disadvantaged.  He welcomed the downtrodden into his home, expecting nothing in return.  And, all the while, he supported his family and raised five children as a single parent and served as the family patriarch.

### i.    *Mohammed created programs that bettered the lives of disenfranchised individuals*

As set forth above, the programs that Mohammed developed at SLUG and Public Works— along with the community programs he has supported—have bettered the lives of disadvantaged individuals and have reduced crime.  A former police officer from the Bayview-Hunters Point neighborhood, Bartholomew Johnson, describes the impact of these Public Works employment and training programs on the local youth:

> Through [that] brilliant idea, Mr. Nuru assisted in making an enormous impact, curbing the high crime rate in the Bayview.  I was astonished at the effect he had made in the community.  Young people that I would usually see hanging out on the street corners selling drugs were now employed by the CCSF [a city program] which brought a sense of pride and confidence and hope. (Ex. C, MNURU_0020).

Mohammed's work cast a wide net and included offering jobs and training to formerly incarcerated individuals, many of whom were able to break the cycle of recidivism.  For example, Carl Williams, a Public Works program mentee, describes how, growing up in the Ingleside

neighborhood, he started violating the law and engaging in "juvenile mischief" at Abraham Lincoln High School, which started a cycle of recidivism, a "never-ending ride through hell." (Ex. C, MNURU_0062). He turned his life around after meeting Mohammed through a friend and enrolling in a training program:

> Mr. Nuru made mention of a city funded training program that was hiring at the time, and I should apply. Let me briefly bring up a quick note to this – at this particular time, I was on FEDERAL PROBATION … That opportunity certified me as a journeyman laborer, and I currently supervise 15 employees in the Bayview district. (*Id.*, MNURU_0063).

Carl further describes how he now acts a mentor to others as he was mentored through the program. He states: "My family is happy, I'm happy and most of all my mom was able to see me as a working, law abiding citizen before she passed away." (*Id.*, MNURU_0064).

A former Public Works colleague, Lynda Penwell, sums up Mohammed's work, explaining,

> These programs provided many people, from all walks of life, an opportunity to gain a trade and join the workforce. Mr. Nuru believes in second chances. He was always open to helping those that might be overlooked. He worked with parolees, pretrial diversion programs, church groups, community-based groups, summer youth job programs, Job Corps and disenfranchised people to provide job training and opportunities. Everyone's success mattered to Mr. Nuru. (Ex. D, MNURU_0067).

### ii. *Mohammed reaches out to those in need, providing shelter and a helping hand*

Again, as set forth above, Mohammed has continuously opened his home to those in need without expecting anything in return; he has readily provided shelter and a helping hand to numerous individuals. Some might stay a few nights or, as did Olusoga Odufalu, more than a year while getting back on their feet. Mohammed has welcomed numerous students into his home, including his own nephews. With his support and mentorship, many students have successfully established themselves, completed their studies, and launched their careers, including Jamey Flowers, quoted above, who is now an architect. (Ex. F, MNURU_0109). Kagiso Molefe, who stayed with the Nurus while attending Skyline College, now works for a biotech company and will obtain a CFO certificate from Columbia. (Ex. F, MNURU_0113). Sanura Dewa, the daughter of a friend who stayed eight months, is now an AmeriCorps VISTA Fellow working for social justice. (Ex. F, MNURU_0110). Mohammed's nephew, Dr. Mohammed Nuru, M.D., for whom

Mohammed provided guidance during his medical studies, is now a physician and brain tumor researcher. (Ex. B, MNURU_0008). Anh Nguyen, a student from Vietnam describes spending time at the Nuru home during the holidays when she had nowhere else to go: "He always invited me on big family holidays like Thanksgiving, Christmas and New Year so that I did not have to spend time alone in the best holidays of the year. . . Without the help, support and kindness of Mohammed and his family, I would not have been able to fulfill my goals and ambitions." (Ex. F, MNURU_0112).

### iii. *As a single father, Mohammed supported his family, providing a loving environment and has served as the family patriarch to the extended Nuru family*

As set forth above, Mohammed led SLUG and Public Works while raising five children as a single father and financially supported the entire family on his own. He had complete responsibility for his children's well-being, which had been negatively impacted by their early childhood experiences of abuse and neglect that stemmed from their mother's substance abuse.

As Samira explained above, Mohammed worked hard to give them a normal life and provide them positive experiences, including sharing his love of nature and working in the garden. He promoted and provided for their education, with all five now having graduated from college.

Mohammed continues to act as the family patriarch. He financially supports several of his children, including his youngest son who graduated from college this spring. Three of his children currently live with Mohammed—and he has a newborn grandchild in his midst. He is a steady presence and emotional pillar for all his ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. He also assists his aging parents—his mother stays with Mohammed for an extended visit at the holidays and Mohammed has provided needed medical equipment and arranges for her medical care.

### iv. *Mohammed still gives back to the community*

When Mohammed's misconduct came to light, he resigned his position at Public Works. But he did not stop helping his community. From July 2020 through June 2021, Mohammed logged over *one thousand hours* at the San Francisco-Marin Food Bank, doing physical labor behind the scenes in the warehouse during the height of the pandemic. For approximately the last year, Mohammed has regularly volunteered at the Candlestick Point State Recreation Area, a state park in Mohammed's neighborhood. James Alberti, who oversees the park's volunteers, values the dedication and knowledge Mohammed brings to this work:

> For about a year, Mohammad Nuru has been coming regularly and has been a very reliable help. He brings his knowledge and experience into the field with him, and is very friendly with the other Helpers, who like his positivity and work ethic. I have been able to rely on Mohammad to help and even sub-lead some projects when things get a little busy. (Ex. C, MNURU_0026).

His continued service to the community—even after this case came to the public's attention—illustrates Mohammed's fundamental commitment to helping others.

### C. The sentencing goals of just punishment and the need to address medical conditions

Section 3553(a) (2) (A) requires the court to consider the need for the sentence imposed "to provide just punishment for the offense." Additionally, section 3553(a)(2)(D) requires the court to consider the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(A) and (D). Both these factors weigh in favor of a three-year sentence.

### i. *Mohammed will suffer substantial collateral consequences*

The question of just punishment for this offense must also consider that substantial punishment has already been realized through the collateral consequences resulting from this criminal conviction. *See, e.g., United States v. Stewart*, 590 F.3d 93, 141 (2nd Cir. 2009)("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence.")

First, after judgment is entered in this matter, Mohammed will face the likely forfeiture of the pension he earned from his twenty years of service with the city of San Francisco. *See* San Francisco City Charter, A8.609-15 ("Any member convicted of a crime involving moral turpitude committed in connection with his or her duties as an officer or employee of the City and County shall forfeit all rights to any benefits under the Retirement System"). For Mohammed, this accumulated pension benefit represents a significant source of funds that he had previously understood to be there for his retirement, and which would allow him to support his family. Likely, no more. This will not only impact him, but also the family members he supports, including his children.

Second, he is now 59-years-old and will re-enter the workforce as a senior individual with very limited opportunities to earn a good living. He will re-enter the economy near retirement age as a convicted felon. His prospects will likely be dim.

Third, under the terms of the plea agreement, Mohammed has forfeited his Lodoga property. And while he unquestionably used illegally received proceeds to partially finance and improve the property, Mohammed also put his own financial and physical capital into the property to develop it into a working farm. He purchased the land and spent many weekends at the Lodoga property with friends and family working and farming the land. This is an enormous emotional and financial loss.

Finally, this criminal matter has damaged Mohammed's personal familial relationships. He no longer communicates with his former life partner, Sandra Zuniga, who acted as a mother to his children. Due to widespread and recurring press, he finds himself a pariah in the city that he has worked to benefit his entire professional life.

These collateral consequences—which will impact him going forward—combined with three years in prison will serve as just punishment for Mohammed's conduct. There is no need for a longer term of incarceration or an additional fine to provide sufficient punishment.

### ii. *Mohammed's tenuous health is likely to negatively impacted during incarceration.*

Section 3553(a)(2)(D) also directs the court to consider the defendant's need for medical care. For Mohammed, time spent in confinement will almost certainly cause his fragile health to decline further. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████

Finally, given Mohammed's health conditions, he faces severe risks from Covid-19 while in custody. People with diabetes and heart disease are more likely to have severe complications if they contract Covid-19.[3] The New York Times has reported that diabetics, outside of the elderly, are the group hardest hit by Covid-19 and constitute between 30 and 40 percent of all Covid-19 deaths.[4] While in confinement, inmates are far more likely to contract Covid-19 than the general

---

[3] *See* Kates Decl., Ex. 10.

[4] *See id.,* Ex. 11..

population.[5] Even after the widespread availability of vaccines, Covid-19 still poses a grave risk to those incarcerated in federal penitentiaries. [6] An NPR analysis revealed that, in 2020, the death rate in prisons run by the BOP was 50% higher than the five years before the pandemic; in 2021, it was 20% higher.[7] A sentence of three years in which Mohammed is designated to an appropriate facility close to his home and capable of addressing his serious health conditions will minimize the substantial risks Covid-19.

### D. A term of three years will provide adequate specific and general deterrence.

Three years in prison will provide sufficient general and specific deterrence, adequately protecting the public. Officials tempted to engage in public corruption and pay-to-play schemes will be on notice that a substantial and life-altering term of incarceration will result from their conduct. They will also understand that they will be forced to forfeit any gains received and will be subject to significant collateral consequences from their wrongdoing.

In Mohammed's specific case, he is now nearing sixty-years-old. It is undisputed that he will not engage in criminal conduct upon his release. Mohammed is truly remorseful for the harm that he has done and upon release will do whatever he can to make amends for his wrongful conduct. As he wrote to this Court:

> I am eager to repair the damage I have done and to work hard to regain the people's belief in our democratic systems and the court's belief in me. Before this, I had no history of criminality. Though I have disappointed myself and others, I will work tirelessly to embody the values with which I was raised and in which I still believe - to be compassionate and truthful, help others maximize their potential, work hard, and honor my blessings from God. (Ex. A, MNURU 0004).

---

[5] *See id.,* Ex. 12 (During the first year of the pandemic, the reported rate of infection among federal prisoners was 39%, with true rates likely to have been much higher.)

[6] See *id.,* Ex. 13 ("[E]ven those who are vaccinated are prone to being reinfected if they are in tight living quarters with those who become infected and are not vaccinated. Prisons present an environment where people are exposed to higher doses of infection that can overwhelm their dose of vaccine protection.")

[7] *See id.,* Ex. 14

**E.      A three-year sentence is proportionate to sentences in related cases and those in similar honest services fraud cases**

A three-year sentence is proportionate to sentences this Court has imposed in related cases as well as to those in similar honest services fraud cases imposed by other courts.

This Court has sentenced two defendants in related cases. Florence Kong received a sentence of one year and one day. Alan Varela received twenty-four months. A three-year sentence for Mohammed would be proportionate to these sentences in that it would recognize that his conduct was more culpable than either of these individuals. Mohammed would be incarcerated for three times as long as Florence Kong and fifty percent longer that Alan Varela. Under the circumstances here, proportionality does not require an even longer sentence than that. And while Mohammed's own panicked mistake rendered him ineligible to receive a 5K1.1 motion, Mohammed, unlike these other defendants who denied their wrongdoing, did cooperate by providing valuable information to the government. In addition, Mohammed will suffer the most severe collateral consequences of the defendants in the related cases, who will all have the opportunity to resume their contracting businesses upon release. By contrast, as set forth above, Mohammed will re-enter the work force as a convicted felon at retirement age and will be virtually unemployable in his trained field. Further, his resources will be depleted—he agreed to forfeit the Lodoga property in which he had invested his own time and financial resources. Also, as stated, he likely will no longer be entitled to the pension he earned as a City employee.

Further, Mohammed's serious medical conditions make the time he spends in custody potentially more impactful in that incarceration could cause or exacerbate additional negative health consequences.

A three-year sentence will be in line with sentences in similar matters while still providing deterrence. For example, one of the most high-profile public corruption scandals of the last several decades revolved around Jack Abramoff, a lobbyist who bribed members of Congress and their staffs to obtain favorable legislative action for his clients The illegal payments to members of Congress included hosting fundraisers, providing lucrative jobs for family members, funding lavish trips, hosting a skybox at sporting events, and strategically timed campaign contributions. In a plea

to honest services fraud and tax evasion, Abramoff admitted receiving over *$23 million in criminal kickbacks* and fraudulently obtained funds from the tribes.  In 2008, Judge Ellen Segal Huvelle of the District of Columbia sentenced Abramoff to *forty-eight months*. *See United States v. Abramoff,* D.C.D.C. Case No. 1:06-cr-00001-ESH, Dkt. 33, 48.  In a related case, one of the Congressmen involved, Robert Ney, admitted to accepting campaign contributions, expensive trips, and other gifts—including a $160,000 golf vacation to Scotland—in exchange for specific legislative actions that benefitted both Abramoff personally and his clients.  In 2007, Judge Huvelle sentenced Ney to *thirty months*. *See United States v. Ney,* D.C.D.C., Case No. 1:06-cr-00272-ESH-1, Dkt. 12, 20.

In several recent honest-services-fraud cases with comparable loss amounts, defendants received sentences of less than three years in custody:

- Ronald Schoenfeld, an employee of PG&E, illegally assisted his cousin in obtaining lucrative transportation contracts and *received kickbacks of more than $1.4 million.* In November 2020, Judge Mueller of the Eastern District of California sentenced him to *twenty-two months*. *See United States v. Schoenfeld,* E.D.C.A. Case No. 2:20-cr-00150-KJM, Dkt. 20, 38.

- Vishesh Giri conspired with his wife to obtain *kickbacks of approximately $707,330 from NASA contractors*, the agency where she was responsible for procuring computers and related hardware.  The government sought a sentence of thirty-five months; in March 2022, Judge Ellis of the Eastern District of Virginia sentenced him to seventeen months.  *See United States v. Giri*, E.D.Va., Case No. 1:21-cr-00196-TSE, Dkt. 20, 24.

- Dr. Jeffrey Gross, a surgeon, pled guilty to conspiracy to commit honest services fraud for accepting approximately *$622,000 in bribes and kickbacks* in exchange for referring his patients to receive spinal surgeries at a corrupt Long Beach hospital.  In July 2021, Judge Josephine Staton of the Central District of California sentenced him to *fifteen months*.  *See United States v. Gross,* C.D.C.A. Case No. 8:18-cr-00014-JLS, Dkt. 148, 234.

## VIII. CONCLUSION

Following the mandate of section 3553(a) to impose a sentence that is "sufficient, but not greater than necessary," we ask this Court to sentence Mohammed to 36 months in custody and forfeiture of the Lodoga property. A three-year sentence will recognize the seriousness of the offense—it will impose a stiff and undeniably life-altering term of incarceration that will profoundly change Mohammed while also putting potential participants on notice that they will face a lengthy sentence if they are caught engaging in corruption. But it will also account for Mohammed's cooperation and his outstanding personal history of assisting those who have been disregarded by society and are otherwise in need while caring for his own family, including his five children as a single parent. Under these circumstances, a three-year sentence with no additional fine will provide just punishment given the significant collateral consequences present here, including the forfeiture of the Lodoga property and the potential forfeiture of Mohammed's pension

Dated: August 18, 2022                    Respectfully submitted,


                                          /s/
                                          RAMSEY & EHRLICH LLP
                                          Miles Ehrlich
                                          Katharine Kates

                                          *Attorneys for Defendant Mohammed Nuru*